UNITED STATES of America,
Plaintiff,

v.

27.7 ACRES OF LAND, MORE OR LESS, IN CARROLL COUNTY, ARKANSAS; and Arkansas & Ozarks Railway Corporation, et al., and Unknown Owners, Defendants.

Civ. A. No. 448.

United States District Court
W. D. Arkansas,
Harrison Division.
Dec. 3, 1959.

Charles W. Atkinson, U. S. Atty., Fort Smith, Ark., for plaintiff.

Warren & Bullion, Little Rock, Ark., Virgil Willis, Harrison, Ark., for Arkansas & Ozarks Ry. Corp.

JOHN E. MILLER, Chief Judge.

On January 19, 1959, the plaintiff filed its complaint to acquire the fee simple title to certain property owned by the defendant, Arkansas & Ozarks Railway Corporation, hereinafter referred to as the railway corporation, and unknown parties, for use in connection with the Table Rock Dam and Reservoir Project.

The property sought to be acquired is described as "a railroad right-of-way, of varying widths, situated in the County of

Carroll, State of Arkansas, lying in Sections 19, 20, and 21, Township 21 North, Range 26 West of the 5th Principal Meridian [then follows a more particular description of the property]. The total length of the above described right-of-way being 10,900 feet, said right-of-way containing 27.7 acres, more or less."

On January 22, 1959, upon motion of the plaintiff, the court ordered:

"* * * that all defendants in this action and all persons in possession or control of the property described in the complaint shall surrender possession of the said property to the plaintiff within five days after service of a copy of this order; provided, that the defendant, Arkansas & Ozarks Railway Corporation, may continue to use the said property at its own risk to the extent and for such time as its use does not interfere with the possession and use of the plaintiff."

On February 12, 1959, the court by order extended the time of the railway corporation 60 days from that date in which to file an answer or other responsive pleading. On April 10, 1959, the answer of the railway corporation was filed in which it, inter alia, alleged:

"3. The defendant, Arkansas & Ozarks Railway Corporation, states that the plaintiff, United States of America, has previously in January of 1959, obtained an order for delivery of possession of the properties involved in this condemnation proceeding and that possession of said properties has been awarded to the plaintiff, United States of America, with a proviso that the defendant might continue to use the said property at its own risk to the extent and for such time as its use does not interfere with the possession or use of the plaintiff; the defendant states that such order imposes an undue burden of hardship upon the defendant, causing it to operate said properties at its own risk subject to any use the plaintiff might desire to make of said property including inundation thereof; the defendant asserts that the operation of a railroad under such conditions is extremely hazardous and unusually costly to it.

"Defendant asserts that the action of the plaintiff in seeking to permit the defendant to continue to use said properties at its own risk and subject to any immediate possession of the plaintiff, is an attempt by the plaintiff to relieve itself of its responsibility not to overflow said railroad and to interfere with the operation thereof; that said proviso imposes a responsibility upon the defendant for the acts of the plaintiff regardless of how or when taken.

"Defendant further asserts that in view of the order of possession to the plaintiff and the hazardous conditions under which defendant is allowed to continue said operation, this cause should be set for an immediate trial at which time the defendant will introduce evidence as to the value of the property and just compensation to it for the taking thereof."

On June 26, 1959, the plaintiff filed an amendment to its complaint, making a great number of individuals parties defendant, and alleged that said individuals have or claim to have an interest in the property taken. The purpose of such amendment was to bring in the former owners of the right-of-way in order that it might be determined whether the railway corporation owned the right-of-way in fee or owned merely an easement for the operation of the railroad. Following the making of such individuals as parties defendant, there have been answers filed by some persons claiming to be the owners of the fee in the right-of-way.

On August 25, 1959, the court entered an order requiring the parties to submit briefs in support of their contentions on the question of the measure of damages in this cause. The brief of the railway corporation was received October 6, 1959,

and the brief of the plaintiff was received October 13, 1959.

On November 25, 1959, the plaintiff filed a "Motion for Pretrial Order," in which plaintiff, inter alia, alleged:

"4. Before the parties can adequately prepare for trial they are entitled to know what is the measure of just compensation to be followed in this case.

"Wherefore, plaintiff, United States of America, prays that the Court enter a pretrial order setting out the measure of just compensation in this case."

The railway corporation on its brief states:

"The oddity of this problem of eminent domain requires an understanding, somewhat, of the total track facilities of condemnee. At the outset it is important to observe that it is a 'one track' railroad, operating only between the towns of Seligman, Missouri (just over the Arkansas line in Missouri) to Harrison, Arkansas, a total distance of 65.4 miles. It owns in toto 69 miles of trackage including some short spur lines from its main track into Berryville, Arkansas and Eureka Springs, Arkansas. On its one rail route from Seligman, southeasterly, to Harrison (population, 4238), the railroad furnishes freight service only to Eureka Springs (pop. 2914), Berryville (pop. 1482), Green Forest (pop. 755), and Alpena (pop. 313). The terrain over which this small one-track railroad traverses is quite mountainous, being located in the heart of the Ozark Mountains. For this reason it is very difficult to find a suitable path for the rails to be laid without increasing the cost of construction out of all proportion to the potential traffic. At its northwesterly terminus, Seligman, its tracks connect with the tracks of St. Louis-San Francisco Railroad Co., and at Harrison, its southeasterly terminus, it does not connect with any rail facility. Nor does it connect with or cross any other rail facility in its total 69 miles of trackage. It is an inlet for interstate freight traffic originating beyond Seligman and delivered there by the Frisco, as an interconnecting rail carrier, to the communities heretofore described, plus an outlet from those communities in reverse. Very little freight traffic both originates and terminates intrastate on its route, most of its business being deliveries into or out of its area of operation.

"The understood location of the 2.064 miles of right-of-way here involved would place this flooded gap in its trackage only about eight to ten miles southeast of Seligman. Thus, and unless a feasible and economical substitute route can be constructed through this rough terrain, most, if not all of which is impassable, condemnee has been effectively and permanently put out of business the same as if the government was taking all of its physical properties. In this connection, it must be remembered that the White River runs generally north and south through Carroll, Benton and Washington Counties, in Arkansas, and there will always be the problem of crossing this river (in addition to the rough terrain), the level of which, we understand, will be greatly raised by the construction of the dam which creates the necessity for this proceeding."

The plaintiff on its brief states:

"This action involves a 'one-track' railroad as indicated by the brief filed by condemnee. In addition to the facts concerning it which condemnee wants understood, condemnor desires to point out that it operates no passenger facilities and operates only three trains per week. It originates a train at one terminus which travels to the other terminus that day. The next day the process is repeated in reverse, and so on, ex-

cept that it operates no trains on Sunday."

The historical facts relating to the various attempts to operate the railroad are as follows:

A railroad, of which the part extending from Harrison, Arkansas, to Seligman, Missouri, was a part, was originally constructed in 1900–1903 by the Missouri & North Arkansas Railway Company. The line when completed extended originally from the City of Helena, Arkansas, on the Mississippi River, west and northwest to Neosho, Missouri, and thence to Joplin, Missouri, over leased tracks, a distance of 330.4 miles. Later, and after the Missouri & North Arkansas Railway Company had gone through a receivership, the ownership was transferred to the Missouri & Arkansas Railway Company, which undertook to operate the railroad as originally operated by the Missouri & North Arkansas Railway Company.

On September 6, 1946, the Missouri & Arkansas Railway Company ceased to operate the railroad, and on February 14, 1947, M. P. Gross and Sol Frankel filed a petition in this court for the appointment of a receiver "to take charge and possession of the property of the defendant corporation and to hold the same intact and to continue the prosecution and defense of any and all actions pending by or against the corporation, in any courts, and any proceedings pending before the Interstate Commerce Commission of the United States or any other governmental bodies; and plaintiffs also pray for such other and further relief as may be just and equitable in the premises."

In accordance with the petition, the court appointed receivers. The course of that case through this court was rather tortuous. See, Gross v. Missouri & Arkansas Ry. Co., D.C., 74 F.Supp. 242.

Subsequent to the opinion, the Interstate Commerce Commission, on August 9, 1948, issued its certificate permitting abandonment by the receivers of the Missouri & Arkansas Railway Company of all lines, spurs, sidings, etc., then being operated by said company.

Following the entry of the order permitting the abandonment, the Governor of Arkansas on behalf of many protestants filed a petition to reopen the proceedings. On October 8, 1948, the proceedings were reopened, and the effective date of the certificate authorizing abandonment of October 9, 1948, was extended to and including December 7, 1948. Re-arguments were submitted, and on December 2, 1948, upon reconsideration, the Commission held that there had been presented no evidence of error of fact or law in the order and certificate of August 9, 1948. The Commission further held that in view of representations to the effect that there were some prospective purchasers interested in acquiring certain portions of the line of railroad for continued operation, the effective date of the certificate and order of August 9, 1948, was extended to and including April 6, 1949.

A portion of the railroad between Cotton Plant, Arkansas, and Helena, Arkansas, was sold to other individuals who attempted to operate it as a railroad, but subsequently all of the line from Cotton Plant, Arkansas, to Helena, Arkansas, was duly abandoned.

On May 31, 1949, one month and twenty-five days after the order permitting the abandonment became final, the Missouri & Arkansas Railway Company entered into a written contract with Royce Kershaw, 210 Pollard Street, Montgomery, Alabama, in which he agreed for a stated consideration to take up and salvage for the owners the portion of the railroad line, spurs, and sidings "between Neosho, Missouri, at mile post 19.77, and Wayne, Missouri, at mile post 51.86, a distance of approximately 32.16 miles, and between Harrison, Arkansas, at approximately mile post 128.5, and Cotton Plant, Arkansas, at mile post 305.88, a distance of approximately 179.-55 miles." See, Royce Kershaw v. Meyer P. Gross, et al., Civil Action No. 287, Harrison Division, Western District of Arkansas, decided Feb. 9, 1952.

Thus, following the salvage operations conducted by the Missouri & Arkansas Railway Company and the sale to the other individuals of the line from Cotton Plant to Helena, Arkansas, there remained only the portion of the railroad now in controversy extending from Harrison, Arkansas, to Seligman, Missouri.

The present stockholders of the railway corporation were the principal stockholders in the Missouri & Arkansas Railway Company, and thus it will be noted that they were unable to operate profitably any of the line of the railroad.

On May 11, 1959, the plaintiff propounded interrogatories to the railway corporation pursuant to Rule 33, F.R. Civ.P., 28 U.S.C.A. The information sought by the alleged interrogatories should have been sought under Rule 34. However, the railway corporation responded by filing the following:

"1. Balance Sheet at December 31, 1958.
"2. Federal income tax returns for the last five years were filed as follows:
1954—2nd District, New York, N. Y.
1955—2nd District, New York, N. Y.
1956—2nd District, New York, N. Y.
1957—1st District, Brooklyn, N. Y.
1958—1st District, Brooklyn, N. Y.
"3. Federal income tax returns for the last five years.
"4. No state income taxe returns were filed for the last five years. (No taxes were due)
"5. None.
"6. Annual Reports were filed with the Interstate Commerce Commission as follows:
1954—Form A
1955—Form A
1956—Form C
1957—Form C
1958—Form C

"7. Copies of the above annual reports submitted herewith are the railroad's copies and should be duplicated. You may then give the Court the duplicate and mail the railroad's copy back to Arkansas & Ozarks.
"8. Copies of statement of operating income and expense for the last five years.
"9. No dividends were paid in the last five years.
"10. No compensation was paid the President, Secretary and Directors for each of the last five years, although officers' salaries of $25,000 were accrued in each of the years 1956, 1957 and 1958."

The documents filed by the railway corporation disclose that it was incorporated on March 4, 1949, and began railroad operations on February 3, 1950; that it is operating a single-line track from Harrison, Arkansas, to Seligman, Missouri, a distance of approximately 70.85 miles, with bridges and spur lines, including those to Eureka Springs and Berryville, Arkansas, of 6.88 miles, making a total length of 77.73 miles. (However, the railway corporation in its brief states: "At the outset it is important to observe that it is a 'one track' railroad, operating only between the towns of Seligman, Missouri (just over the Arkansas line in Missouri) to Harrison, Arkansas, a total distance of 65.4 miles. It owns in toto 69 miles of trackage including some short spur lines from its main track into Berryville and Eureka Springs, Arkansas.")

At the time of the organization of the railway corporation, a total of $200,000 of capital was advanced by its organizers, and since the start of its operations the corporation has not paid any dividends. Its general officers have not drawn any salaries, although for the years 1956, 1957 and 1958 an expense of $25,000 per year has been accrued for officers' salaries.

The balance sheet as of December 31, 1958, shows a stockholders equity of only $23,036.60 of the $200,000 investment.

The losses accruing to the corporation from its operation are increasing yearly:

|                | 1954      | 1955    | 1956     | 1957     | 1958     |
|----------------|-----------|---------|----------|----------|----------|
| Total Income   | $190,130  | 164,895 | 205,477  | 203,529  | 154,268  |
| Total Expense  | 195,478   | 179,589 | 237,839  | 245,232  | 213,894  |
| Income or Loss | −5,439    | −14,694 | −32,361  | −41,203  | −59,626  |

The average total annual income for the years 1954–58, both inclusive, was $183,660. The average annual total expenses was $214,406, thus showing an average annual loss for the five years of $30,746.

The total trackage condemned is approximately 2.064 miles, which includes a large steel bridge across the White River, and leaves approximately 9 miles of trackage extending from the north and west sides of the Reservoir to Seligman, Missouri, and approximately 57 miles of trackage extending from the south and east sides of the Reservoir through the towns of Eureka Springs, Berryville and Green Forest to Harrison, Arkansas.

At the time of the filing of the complaint the railway corporation was not operating any passenger trains, and was carrying very little, if any, intrastate freight. The only source of income was from interstate freight, which was delivered to the defendant by the Frisco at Seligman, Missouri, for delivery to the consignees in the four towns in Arkansas, and in the reverse the interstate shipments consigned from the four towns in Arkansas to Seligman, Missouri, or points beyond Seligman located on other railroads.

In United States v. Grizzard, 1911, 219 U.S. 180, 31 S.Ct. 162, 55 L.Ed. 165, the Court, after quoting from Amendment V to the Constitution of the United States "nor shall private property be taken for public use without just compensation," at page 184 of 219 U.S., at page 163 of 31 S.Ct. said:

"The 'just compensation' thus guaranteed obviously requires that the recompense to the owner for the loss caused to him by the taking of a part of a parcel, or single tract of land shall be measured by the loss resulting to him from the appropriation. If, as the court below found, the flooding and taking of a part of the plaintiffs' farm has depreciated the usefulness and value of the remainder, the owner is not justly compensated by paying for only that actually appropriated, and leaving him uncompensated for the depreciation over benefits to that which remains. In recognition of this principle of justice it is required that regard be had to the effect of the appropriation of a part of a single parcel upon the remaining interest of the owner, by taking into account both the benefits which accrue and the depreciation which results to the remainder in its use and value."

At page 185 of 219 U.S., at page 164 of 31 S.Ct., the Court quoted from Bauman v. Ross, 167 U.S. 548, 17 S.Ct. 966, 42 L.Ed. 270, as follows:

"'Consequently when part only of a parcel of land is taken for a highway, the value of that part is not the sole measure of compensation or damages to be paid to the owner; but the incidental injury or benefit to the part not taken is also to be considered. When the part not taken is left in such shape or condition as to be in itself of less value than before, the owner is en-

titled to additional damages on that account.' "

See also, United States v. Chicago, B. & Q. R. Co., 8 Cir., 1936, 82 F.2d 131, 106 A.L.R. 942; United States v. Chicago, B. & Q. R. Co., 7 Cir., 1937, 90 F.2d 161.

■ In the instant case, since a portion of the railroad has been taken, the railway corporation is entitled to recover the market value of the part taken together with damages for the depreciation, if any, of the remainder of the railroad. In such a situation as is here presented the measure of just compensation for the physical property taken is the difference between the market value of the entire line of railroad immediately before the taking and the market value of the portion that remains after the taking.

The freight rates and, in fact, all operations of the railway corporation, as well as the continuance or abandonment of the railroad, are subject to regulation and control by Part 1 of the Interstate Commerce Act. Title 49 U.S.C.A. §§ 1–27, both inclusive.

Title 49 U.S.C.A. § 1, par. (18), provides:

"* * * no carrier by railroad subject to this chapter shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity permit of such abandonment."

The amount of the income of the railway corporation is determined largely, if not entirely, by the freight rates approved by the Interstate Commerce Commission. Under its charter the defendant has the right to operate the railroad in accordance with the Interstate Commerce Commission Act and all valid regulations issued by the Commission, and, of course, cannot voluntarily abandon it.

However, the plaintiff has a superior right to condemn and acquire for public use any portion or all of the railroad property. The plaintiff has acquired a vital part of the property required by the railway corporation in the operation of the railroad, and, having acquired such property, the court must appraise the situation of the railway corporation created and proximately caused by the taking. This brings the court to the question of what elements should be considered in determining the market value.

■ The facts reflected in the documents filed by the railway corporation establish beyond a doubt that the operation of the railroad had proved to be a failure prior to the filing of the complaint, and, as stated in Roberts v. City of New York, 1935, 295 U.S. 264, at page 282, 55 S.Ct. 689, at page 693, 79 L.Ed. 1429, "substantial prices are not paid for the privilege of conducting a business at a loss."

In addition to owning the track and spurs, the railway corporation may own in fee some of the right-of-way, but no doubt it does not own all of the right-of-way but only owns easements for the purpose of the operation of the railroad. The franchise to operate the railroad and collect freight charges, passenger fares, etc., granted by its charter and to the use of the right-of-way may at one time have been valuable, but in view of the admitted facts it is of little or no value now. The question to be finally determined is what has the owner or the railway corporation lost, not what the plaintiff has gained by the taking. The evidence in the record is convincing that the railway corporation has lost only the salvage value of the property used in the operation of the railroad. See, Roberts v. City of New York, supra.

In Monongahela Navigation Co. v. United States, 1893, 148 U.S. 312, 13 S.Ct. 622, 37 L.Ed. 463, the United States condemned lock and dam No. 7, which prior to condemnation was owned and operated by the Navigation Company. The Navigation Company had expended large sums of money in improving the Monongahela River, and its business was being operated at a profit at the time the condemnation suit was filed. In discuss-

ing the elements of just compensation, the Court at pages 328–329 of 148 U.S., at page 627 of 13 S.Ct. said:

"The value of property, generally speaking, is determined by its productiveness—the profits which its use brings to the owner. Various elements enter into this matter of value. Among them we may notice these: Natural richness of the soil as between two neighboring tracts. One may be fertile, the other barren; the one so situated as to be susceptible of easy use, the other requiring much labor and large expense to make its fertility available. Neighborhood to the centres of business and population largely affects values, for that property which is near the centre of a large city may command high rent, while property of the same character, remote therefrom, is wanted by but few, and commands but a small rental. Demand for the use is another factor. The commerce on the Monongahela river, as appears from the testimony offered, is great; the demand for the use of the lock and dam constant. A precisely similar property, in a stream where commerce is light, would naturally be of less value, for the demand for the use would be less. The value, therefore, is not determined by the more cost of construction, but more by what the completed structure brings in the way of earnings to its owner. For each separate use of one's property by others the owner is entitled to a reasonable compensation, and the number and amount of such uses determines the productiveness and the earnings of the property, and, therefore, largely its value. So that if this property, belonging to the Monongahela Company, is rightfully where it is, the company may justly demand from every one making use of it a compensation; and to take that property from it deprives it of the aggregate amount of such compensation, which otherwise it would continue to receive. What amount of compensation for each separate use of any particular property may be charged is sometimes fixed by the statute which gives authority for the creation of the property; sometimes determined by what it is reasonably worth; and sometimes, if it is purely private property, devoted only to private uses, the matter rests arbitrarily with the will of the owner. In this case, it being property devoted to a public use, the amount of compensation was subject to the determination of the state of Pennsylvania, the state which authorized the creation of the property. The prices which may be exacted under this legislative grant of authority are the tolls, and these tolls, in the nature of the case, must enter into and largely determine the matter of value."

The railway corporation concedes that the railroad could not be relocated. In its brief the following statement is made:

"The terrain over which this small one-track railroad traverses is quite mountainous, being located in the heart of the Ozark Mountains. For this reason it is very difficult to find a suitable path for the rails to be laid without increasing the cost of construction out of all proportion to the potential traffic."

Also, the inference to be drawn from the brief of the railway corporation is that the cost of raising the track and building a new bridge across White River is prohibitive when considered from a profit angle. Therefore, since the plaintiff has taken a part of the physical assets of the railway corporation, the plaintiff should pay it the market value of the part taken, together with damage to the part not taken, plus the value of its franchise or operating rights, if any.

Therefore, the parties are ordered and directed to confine their proof in accordance with the principles outlined in this opinion.