Charles **MYERS** and William Myers, partners, doing business as Myers Milling Company, Claridge Products & Equipment Company, a corporation, Richard R. Thompson, and Carroll Hanby, Jack Hanby and Robert Hanby, partners, doing business as Ozark Sash & Door Company, Plaintiffs,

v.

**ARKANSAS & OZARKS RAILWAY CORPORATION**, Murray M. Salzberg, Meyer P. Gross, Morris Snerson, Maurice I. Schwartz, Rochester Iron & Metal Company, a corporation, Eugene R. Warren, Bruce Bullion, and R. Eugene Bailey, Defendants.

**Civ. A. No. 474.**

United States District Court
W. D. Arkansas,
Harrison Division.

June 30, 1960.

---

Thomas Harper, Ft. Smith, Ark., William S. Walker, Harrison, Ark., J. E. Simpson, Berryville, Ark., for plaintiffs.

Eugene R. Warren, Little Rock, Ark., Virgil D. Willis, Harrison, Ark., for defendants.

JOHN E. MILLER, Chief Judge.

This is a proceeding in which the plaintiffs ask that a preliminary injunction be issued "enjoining defendants, and each and every one of them, from directly or indirectly abandoning or ceasing operations of the defendant Arkansas & Ozarks Railway Corporation and from refusing to receive, deliver, or transport freight thereby, and that, upon final

hearing, said preliminary injunction be made permanent, * * *."

The complaint was filed June 7, 1960. The individual plaintiffs are citizens of Arkansas and are patrons of defendant Arkansas & Ozarks Railway Corporation. The plaintiff Claridge Products & Equipment Company is an Illinois corporation, authorized to do business in Arkansas, with a place of business at Harrison in Boone County.

The defendant Arkansas & Ozarks Railway Corporation is a railroad corporation organized and doing business pursuant to the laws of the State of Arkansas, with its principal office at Harrison, Boone County, Arkansas. The individual defendants are directors and/or stockholders of the railroad corporation, with the exception of R. Eugene Bailey, who has no connection whatsoever with the railroad corporation.

The plaintiffs allege:

"3.

"This action arises under Section 1, Paragraphs (18) and (20) of Title 49, United States Code, as hereinafter more fully appears, and this court has jurisdiction hereof.

"4.

"Since 1949 and prior to May 7, 1960, the defendant Arkansas & Ozarks Railway Corporation was engaged in the operation of a line of railroad as a common carrier of freight for hire between the points of Harrison, Arkansas, and Seligman, Missouri, and by interline rail connections at Seligman, Missouri, to and from Harrison and all other points and places in the United States, in interstate commerce, and likewise serving the intermediate points of Berryville, Green Forest, Eureka Springs and other intermediate points, all within the State of Arkansas and the jurisdiction of this court, by virtue of a certificate of convenience and necessity theretofore obtained by said defendant from the Interstate Commerce Commission.

"5.

"All of the plaintiffs hereinabove named were on and before May 7, 1960, shippers and receivers of freight by means of said defendant railroad, and as such are parties in interest within the meaning of Section 1, Paragraph (20), Title 49, United States Code.

"6.

"On May 7, 1960, the defendant railroad company abandoned the operation of trains over its line of railroad and completely ceased operations thereof. Defendant railroad has not obtained from the Interstate Commerce Commission a certificate authorizing the abandonment of the operation thereof, and the abandonment of its operations and cessation of its service to plaintiffs and other members of the public in the transportation of goods and commodities over said railroad without first obtaining from said Commission a certificate that the present or future convenience and necessity permit of such abandonment is wholly unlawful. To the best of plaintiffs' information and belief, said defendant railroad company has never even applied to the Interstate Commerce Commission for such a certificate.

"7.

"As a result of such unlawful abandonment, plaintiffs and others similarly situated have been, and continue to be, greatly damaged, for the reason that plaintiffs and other shippers and receivers of freight in the cities, towns and communities hereinabove described are wholly and completely without any railroad service, since no other line of railroad operates between the points aforesaid and serves the said terminal and intermediate points above described.

"8.

"Pursuant to the provisions of Section 1(20) of Title 49, United States Code, this court should enjoin the abandonment of the operation of said railroad."

Upon the filing of the complaint the court, by order, directed that notice of the application for preliminary injunction be given all defendants, and fixed June 20, 1960, at 9:30 a. m., as the date for the hearing. On June 16, prior to the hearing on June 20, the defendants filed their "Response" in which they admitted that the plaintiffs were on or before May 7, 1960, shippers and receivers of freight by means of the defendant railway company. However, they denied paragraphs 6, 7 and 8 of the plaintiffs' complaint as hereinbefore set forth. The defendants further alleged:

"7.

"The defendants deny that rail service was voluntarily abandoned by the Arkansas and Ozarks Railway Corporation, but assert the facts to be as follows: On January 22, 1959, the U. S., in a condemnation action, obtained title to 2.8 miles of the tracks and bridges and right-of-way of the Arkansas and Ozarks Railway Corporation. An order was entered by the United States District Court as of that date giving full title to these properties to the United States which severed the railway line leaving 98% thereof detached and isolated with no outlet or connection either to the north or the south or the east or west. Thereafter, on May 5–6, 1960, a substantial section of the railroad's track was washed out and the right-of-way undermined by a flood occurring as a result of severe rains in the area. One bridge in said section was completely destroyed while several other bridges were severely damaged. This substantial washout made it impossible for the defendant railroad to continue its operations. The defendant immediately began a survey as to the estimated costs to repair this damage to its right-of-way, tracks and bridges. The estimated cost presented to the defendants to repair this damage in a temporary manner was in excess of $12,000 and the estimated cost to repair this section permanently was $77,000. A careful study reflected that such restoration and repair were not feasible; that even if the washed out section was repaired the defendant railroad could not resume operations from Harrison to Seligman without using at its own risk the bridges, trestles and tracks condemned and owned by the United States and to which the defendant has no title. Bridge 73–2, which is the largest of the bridges condemned, is in the opinion of the defendant railroad unsafe for use by trains and the defendant cannot in good conscience or with reasonable and rational business judgment direct or allow its employees to operate a train over said bridge. Said bridge is a condemned structure which has been partially inundated as a result of the raising of the power pool for Table Rock Dam and Reservoir. It has not been possible, even with the use of divers, to investigate the mud sill footings of this bridge to determine the extent of damage thereto. In the exercise of its business judgment, the defendant railroad cannot endanger its equipment by attempting to cross said bridge with it nor can it resume any regular service with any assurance of safe and regular crossings. The defendant railroad asserts that it cannot and should not be compelled to operate its trains at its own risk over tracks and bridges which it does not own and over which it does not have any control and which in the exercise of its business judgment it considers dangerous to life and property.

"8.

"The defendants, having determined that further railway operations were impossible, unsafe and

contrary to rational business judgment, filed an application for abandonment of railway operations with the Interstate Commerce Commission on June 9, 1960, same being Finance Docket No. 21148. Return to Questionnaire has been duly filed and a hearing date is anticipated in the immediate future."

49 U.S.C.A. § 1, par. (18), provides:

" * * * No carrier by railroad subject to this chapter shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity permit of such abandonment."

Par. (19) sets forth the procedure governing the filing of an application for the issuance of any certificate by the Commission.

Par. (20) provides:

" * * * Any construction, operation, or abandonment contrary to the provisions of this paragraph or of paragraph (18) or (19) of this section may be enjoined by any court of competent jurisdiction at the suit of the United States, the Commission, any commission or regulating body of the State or States affected, or any party in interest; * * *."

The plaintiffs are interested in the continued operation of the railroad, and are, therefore, parties in interest.

The history of the defendant railway is set forth in United States of America v. 27.7 Acres of Land, More or Less, in Carroll County, Arkansas, and Arkansas & Ozarks Railway Corporation et al., D.C.W.D.Ark.1959, 178 F.Supp. 712, and will not be repeated here. Suffice it to say that, prior to January 22, 1959, all that remained of the railroad which the predecessors of the defendant operated which formerly extended from Helena, Arkansas, on the Mississippi River west and northwest to Neosho, Missouri, and thence to Joplin, Missouri, over leased tracks, a distance of 330.4 miles, was a single line track from Harrison, Arkansas, to Seligman, Missouri, a distance of approximately 70.85 miles, with bridges and spur lines including those to Eureka Springs and Berryville, Arkansas, of 6.88 miles, making a total length of 77.73 miles.

On January 19, 1959, the United States of America filed its suit to condemn a portion of the railroad right-of-way of varying widths of the total length of 10,900 feet and containing 27.7 acres, more or less. On January 22, 1959, the court, in the condemnation suit (178 F.Supp. 712), entered the following order:

"On this 22 day of January, 1959, on motion of the plaintiff for an order of possession of the property described in the complaint, it appearing; that,

"Although no declaration has been filed pursuant to the Declaration of Taking Act and no deposit of just compensation has been delivered to the Clerk, the United States of America has made adequate provision for the payment of just compensation and the full faith and credit of the United States of America has been pledged to secure such payment, and the said plaintiff is entitled to the possession of said property.

"Therefore, it is hereby ordered and adjudged that all defendants in this action and all persons in possession or control of the property described in the complaint shall surrender possession of the said property to the plaintiff within five days after service of a copy of this order; provided, that the defendant, Arkansas & Ozarks Railway Corporation, may continue to use the said property at its own risk to the extent and for such time as its use does not interfere with the possession and use of the plaintiff."

Notwithstanding the fact that the title to that portion of the railroad was vested in the United States of America, the defendant railway continued to operate its

train from Harrison, Arkansas, to Seligman, Missouri, until severe rains on May 5–6, 1960, caused flood waters to rise and inundate several sections of the right-of-way extending northwesterly from Eureka Springs and east or southeast of the portion that had been condemned by the United States. As a result of the heavy downpour, one of the bridges was completely washed away, two bents in another bridge were lost and several hundred feet of track at various locations were washed out to depths up to six feet. Bridge 73–2, which is in the condemned portion, sustained severe damage as well as other bridges in the same section. When the washout occurred, the defendant railway was compelled to cease operating its train and immediately placed an embargo on freight movements.

The plaintiffs contend that under the statute hereinbefore set forth they are entitled to an injunction enjoining the defendants from the abandonment of the line or any portion thereof unless a certificate of convenience and necessity permitting such abandonment is issued by the Interstate Commerce Commission. On the other hand the defendants contend that they have not voluntarily abandoned the railroad and that it was necessary to cease the operation of its train because of the washouts in the area not included in the condemned portion as well as damage to bridges in the condemned portion.

At the hearing testimony was adduced by all parties. Oral arguments were submitted and, subsequent to the hearing, written briefs have been submitted in further support of the contentions of the parties.

■ The court is of the opinion that the cessation of the operation of trains by the defendant railway corporation was not voluntary within the mean'ng of the law but that it was impossible to operate the trains because of the damage to the portion of the uncondemned track as well as damage to certain bridges within the condemned area.

■ To "abandon" within the context of the statute means to give up permanently, not merely to suspend operations. No Commission approval is necessary where the cessation of operations results not from the volition of the railroad but as a result of conditions over which the railroad has no control. Zirn et al. v. Hanover Bank et al., 2 Cir., 1954, 215 F.2d 63, 69.

In Williams v. Atlantic Coast Line R. Co., 4 Cir., 1927, 17 F.2d 17, the court, at page 22 of 17 F.2d, said:

"Abandonment involves more than mere nonuser. There must be an intention on the part of the company to abandon." Citing cases.

On June 9, 1960, the railway corporation filed an application for a certificate of convenience and necessity authorizing it to abandon the railroad. Among other allegations in the application, the railway corporation alleged:

"The company has sustained substantial losses in each of the last five years. Its net losses have increased from $14,694.00 in 1955 to $56,937.-00 in 1959. Its total net loss during this period was $205,321.00."

See, also, United States of America v. 27.7 Acres of Land, More or Less, in Carroll County, Arkansas, and Arkansas & Ozarks Railway Corporation, supra; Chamber of Commerce of Demopolis, Alabama, et al. v. Southern Railway Company (1934), 206 I.C.C. 70; and A. & B. B. Railroad Company, Abandonment of Operation, 239 I.C.C. 250.

The plaintiffs contend that the bridges on the condemned portion of the railroad are not in a dangerous condition, but the defendants contend that they are dangerous because of the rising waters in the Table Rock Reservoir. But, regardless of whether those bridges are now dangerous, the defendant railway company has no right whatsoever to expend any money in repairing the bridges or in making any change whatsoever in the railway track in the portion that was.

condemned. The fact that the court entered an order permitting the railway corporation to use the condemned portion at its own peril is not mandatory. As a matter of fact, the railroad cannot operate if it loses its interline connection at Seligman, Missouri, and in order to reach Seligman, Missouri, from Harrison, Arkansas, it will be necessary to cross the Table Rock Reservoir or find some feasible route around the lake. The United States cannot be compelled to grant a right-of-way across its property, and, therefore, the railway corporation is faced with a situation which would require the expenditure of a great sum of money to continue its operations between Harrison, Arkansas, and Seligman, Missouri. Whether the railroad corporation is or will be financially able to locate and build a new line around the Table Rock Reservoir is not now before the court, and is a matter that will possibly be considered by the Interstate Commerce Commission when it considers the application of the railroad for abandonment of the entire line.

■ The court is of the opinion that the facts do not justify the granting of any order enjoining the defendants from temporarily suspending the operation of its trains. There is nothing in the record or in the testimony to indicate that the defendants are financially able to continue to operate the railroad or to make the necessary repairs that have been made necessary by the severe rains.

■ The granting or withholding of a preliminary injunction rests in the sound discretion of the trial court. Williamson Candy Co. v. Ucanco Candy Co., 8 Cir., 1924, 297 F. 454; Speer et al. v. Rural Special School District et al., 8 Cir., 1938, 100 F.2d 202.

In Richards et al. v. Meissner et al., C. C., 158 F. 109, the court, at page 110, said:

"The granting of a temporary injunction rests largely in the sound discretion of the chancellor. While it does not finally determine the rights of the parties to the action, and is intended only to preserve the existing status until the case can be fully heard, and therefore it is not necessary that the court should, before granting it, be satisfied that the complainant will certainly prevail upon the final hearing of the case, the court should, nevertheless, be careful that the complainant has a probable right, and that there is probable danger that such right will be defeated without the special interposition of the court. It is equally true that where, on the showing made at the preliminary hearing, the law as to the right to an injunction is quite doubtful, and that as much, if not more, injury would probably ensue to the defendants than to the complainants, and especially where, in the event of the bill being dismissed on final hearing, there is grave doubt of an adequate redress to the defendants resulting from the injunction, the court should refuse the application for a temporary injunction, and await action until all the facts appear on final hearing."

■ Therefore, the court is entering an order today denying the preliminary injunction and, because of the facts disclosed by the testimony of witnesses and the exhibits, further action on the application for a permanent injunction will be postponed until the Interstate Commerce Commission has had an opportunity to act on the application of the defendant railway company for a certificate of convenience and necessity authorizing the abandonment of the remaining portion of the railroad. See, Purcell v. United States, 1942, 315 U.S. 381, 62 S. Ct. 709, 86 L.Ed. 910.