See also 178 F.Supp. 712.

**UNITED STATES of America,
Plaintiff,**

v.

**27.7 ACRES OF LAND, MORE OR LESS, IN CARROLL COUNTY, ARKANSAS, and Arkansas & Ozarks Railway Corporation, et al., and Unknown Owners, Defendants.**

**Civ. A. No. 448.**

United States District Court
W. D. Arkansas,
Harrison Division.

March 8, 1963.

Charles M. Conway, U. S. Atty., Robert E. Johnson, Asst. U. S. Atty., Ft. Smith, Ark., for plaintiff.

Warren & Bullion, Little Rock, Ark., for defendants.

Virgil Willis, Harrison, Ark., for Mr. and Mrs. Neis.

JOHN E. MILLER, Chief Judge.

The United States of America, as plaintiff, acquired a portion of the right of way of the defendant, Arkansas & Ozarks Railway Corporation, hereinafter designated as railway, for use in connection with the Table Rock Dam and Reservoir Project. The complaint contains a description of the specific property, but may be summarized as a right of way 10,900 feet in length and of varying widths, containing 27.7 acres, more or less, situated in Carroll County, Arkansas. The complaint was filed January 19, 1959, and three days later the court, upon motion of the plaintiff, entered an "Order for Delivery of Possession," in which the court directed that all defendants in the action and all persons in possession or control of the property described in the complaint "shall surrender possession of the said property to the plaintiff within five days after service of a copy of this order; provided, that the defendant, Arkansas & Ozarks Railway Corporation, may continue to use the said property at its own risk and to the extent and for such time as its use does not interfere with the possession and use of the plaintiff."

On April 10, 1959, the railway filed its answer, in which it referred to the order of possession, and stated "that such order imposes an undue burden of hardship upon the defendant, causing it to operate said properties at its own risk subject to any use the plaintiff might desire to make of said property including inundation thereof; the defendant asserts that the operation of a railroad under such conditions is extremely hazardous and unusually costly to it.

"Defendant asserts that the action of the plaintiff in seeking to permit the defendant to continue to use said properties at its own risk and subject to any immediate possession of the plaintiff, is an attempt by the plaintiff to relieve itself of its responsibility not to overflow said railroad and to interfere with the operation thereof; that said proviso imposes a responsibility upon the defendant for the acts of the plaintiff regardless of how or when taken.

"Defendant further asserts that in view of the order of possession and the hazardous conditions under which defendant is allowed to continue said oper-

ation, this cause should be set for an immediate trial at which time defendant will introduce evidence as to the value of the property and just compensation to it for the taking thereof."

On June 26, 1959, the plaintiff filed an amendment to its complaint and thereby made as parties defendants a great many individuals named in said amendment. Of the individual defendants, William L. Neis and wife filed an answer and alleged that they were the owners in reversion of a portion of the land taken by the plaintiff, and that when the railway ceases to use that portion of the right of way owned by them, the fee simple title will revert to them.

The railway and Mr. and Mrs. Neis asked that just compensation be awarded them in accordance with the provisions of Amendment 5 to the Constitution of the United States.

In United States v. Petty Motor Co., (1946) 327 U.S. 372, 66 S.Ct. 596, 90 L.Ed. 729, the court at page 377 of 327 U.S., at page 599 of 66 S.Ct., in discussing the meaning of "just compensation" said:

"The Constitution and the statutes do not define the meaning of just compensation. But it has come to be recognized that just compensation is the value of the interest taken. This is not the value to the owner for his particular purposes or to the condemnor for some special use but a so-called 'market value.' It is recognized that an owner often receives less than the value of the property to him but experience has shown that the rule is reasonably satisfactory. Since 'market value' does not fluctuate with the needs of the condemnor or condemnee but with general demand for the property, evidence of loss of profits, damage to good will, the expense of relocation and other such consequential losses are refused in federal condemnation proceedings."

The court believes it will be helpful to recite some of the historical facts relative to the attempts to operate a railroad through the territory traversed by the defendant railway.

In 1900–03 the Missouri & North Arkansas Railway Company constructed a line of railroad from the City of Helena, Arkansas, on the Mississippi River west and north to Neosho, Missouri, and from Neosho, Missouri, to Joplin it operated over leased tracks. The total distance between Helena, Arkansas, and Joplin, Missouri, was 330.4 miles. The original company encountered financial difficulties and after it had gone through a receivership, the railroad was transferred to another corporation, Missouri & Arkansas Railway Company, which undertook to operate the railroad as originally operated by the Missouri & North Arkansas Railway Company.

On September 6, 1946, the Missouri & Arkansas Railway Company ceased to operate the railroad, and on February 14, 1947, certain stockholders filed a petition in this court for the appointment of a receiver "to take charge and possession of the property of the defendant corporation and to hold the same intact and to continue the prosecution and defense of any and all actions pending by or against the corporation in any courts, and any proceedings pending before the Interstate Commerce Commission of the United States or any other governmental bodies." In accordance with the petition this court on the same date, February 14, 1947, appointed two receivers in accordance with the prayer of the petition.

On May 14, 1947, the State of Arkansas was permitted to file an intervention in which it alleged the lack of good faith on the part of the stockholders to operate the railroad. A hearing was held on that intervention on June 6, 1947, and an additional receiver was appointed. In the meantime, the Missouri & Arkansas Railway Company had filed a petition with the Interstate Commerce Commission to obtain a certificate of convenience and necessity to abandon the railroad. That petition of the railway company was pending when this court appointed the additional receiver on June 6, 1947,

and the court instructed the receivers (1) to request the Interstate Commerce Commission to refrain for a period of 90 days from rendering a decision on the petition for a certificate of convenience and necessity to abandon the railroad; (2) to receive and consider plans for resumption of operation; and (3) to consider any offer to purchase or lease the whole or any part of said railroad.

In accordance with the instructions, the receivers filed a report in which they recommended that operation of the railroad be resumed, and many suggestions and numerous plans were submitted by third parties for the resumption of the operation of the railroad. It became apparent, however, that a resumption of operation would require a large capital outlay and an enormous amount of work and planning. It was necessary if operation was to be resumed to completely rehabilitate the entire line, but notwithstanding those difficulties every effort was made without success to resume operations.

On October 15, 1947, the Cities of Eureka Springs and Berryville filed a motion for leave to intervene, which motion was denied. On October 31, 1947, Richard Thompson and other erstwhile patrons of the railroad filed a motion to intervene which motion was denied. See, Gross v. Missouri & Ark. R. Co., (W.D. Ark.1947) 74 F.Supp. 242.

In due time the Interstate Commerce Commission issued its certificate of convenience and necessity permitting the abandonment of the line of railroad extending from Helena, Arkansas, to Neosho, Missouri. Every effort was made to sell portions of the railroad and, in fact, that part extending from Helena, Arkansas, to Cotton Plant, Arkansas, was sold but the purchasers were unable to operate it, and after a short time that portion was abandoned and salvaged. The corporation then salvaged the line from Cotton Plant, Arkansas, to Harrison, Arkansas, but retained for operation the portion extending from Harrison, Arkansas, to Seligman, Missouri, which was transferred to the present defendant, Arkansas & Ozarks Railway Corporation.

On November 25, 1959, the plaintiff filed "Motion for Pretrial Order." Prior to the filing of this motion, the court and the attorneys for the plaintiff and for the defendant railway had many conferences in an effort to narrow the issues and to determine the elements that should be considered by the court in arriving at just compensation. The record discloses that on August 25, 1959, the court, on its own motion, ordered the railway to file a brief in support of its claim to just compensation and "particularly the measure thereof." In the same order the court required the plaintiff to file its brief on said question after receipt by counsel of the brief of the railway. The briefs were duly filed and considered by not only the court but by the attorneys representing the parties. In the motion for the pretrial order the plaintiff alleged that "before the parties can adequately prepare for trial, they are entitled to know what is the measure of just compensation to be followed in this case." Again the court conferred with counsel on both sides, and, because of the physical condition of the railroad, the court undertook to announce the rules which it believed should be followed by counsel in the trial of the case on the question of just compensation. The court filed its opinion on December 3, 1959, D.C., 178 F.Supp. 712, in which the known and admitted facts were reviewed and stated in its opinion the rule that should be followed in determining just compensation. A reference to D.C., 178 F.Supp. 712 will reveal that the total average income of the railway derived from the operation of the line from Harrison, Arkansas, to Seligman, Missouri, for the five years 1954 to 1958, both inclusive, was $183,660.00. The average annual total expense was $214,406.00. The average annual loss for the five years was $30,746.00. Also, the income gradually lessened each year the road was in operation and the expenses increased. The officers had received no money for their

work, and, in fact, the railway was insolvent and unable to operate, and it was in that setting that this court filed its opinion as above referred to.

On February 15, 1960, the City of Berryville, Arkansas, filed its motion for permission to intervene, in which it was alleged that in 1901 a predecessor of the defendant had entered into a contract with the city whereby the city acquired a permanent right to require the operation of trains in and through the City of Berryville. On April 28, 1960, the court denied the motion to intervene.

Upon the filing of the complaint the plaintiff did not file a declaration of taking, and the order for delivery of possession contained the proviso that the railway might continue to operate at its own risk to the extent and for such time as its use did not interfere with the possession and use of the plaintiff. Notwithstanding the road was being operated at a loss and was not being maintained, the stockholders continued to operate until severe rains on May 5 and 6, 1960, caused flood waters to rise in Leatherwood Creek and inundated several sections of the right of way extending northwesterly from Eureka Springs to a point east or southeast of the portion that had been condemned by the plaintiff. As a result of this heavy downpour, one of the bridges was completely washed out, two bents and another bridge were lost, and several hundred feet of track at various locations were washed out to depths up to six feet. Water rose in the reservoir area, and bridge 73–2 (Butler Creek Bridge), which is in the condemned portion, sustained severe damage. When the washout occurred the railway was compelled to cease operating its train and immediately placed an embargo on freight movements. The water reached its peak in the reservoir area on May 23, 1960, and the railway claimed that some of the bridges in the condemned area were so severely damaged by water standing under them as to make it unsafe to continue to operate even if the other damaged sections not in the condemned area were repaired. Regard-less of whether the bridges in the reservoir area were damaged, the railway was not in a position, because of the heavy cost, to repair the flood damage to the area outside the reservoir, and on June 9, 1960, the railway filed its application with the Interstate Commerce Commission for authority to abandon the railroad. The application was granted on April 7, 1961, subject to sale for net salvage value of the line or any part thereof to any person desiring to operate the railroad. Prior to the granting of the certificate of convenience and necessity, permitting the railway to abandon the line, the General Assembly of Arkansas on February 8, 1961, enacted Act 62 of 1961, levying a prohibitive tax on rails and/or property of abandoned railroads.

On June 7, 1960, two days before the application for authority to abandon was filed, but subsequent to May 6, 1960, when operations on the railroad ceased, a suit was filed in this court by Charles Myers and others against the railway and its stockholders for a preliminary injunction "enjoining defendants and each and everyone of them from directly or indirectly abandoning or ceasing operations of the defendant, Arkansas & Ozarks Railway Corporation, and from refusing to receive, deliver, or transport freight thereby and that, upon final hearing, said preliminary injunction be made permanent."

The plaintiffs contended that they were entitled to an injunction enjoining the defendants from abandoning the railway or any portion of it unless a certificate of convenience and necessity was issued by the Interstate Commerce Commission. On the other hand, the defendants contended that they had not voluntarily abandoned the railroad but that it was necessary to cease the operation of its trains because of the washouts in the area not included in the condemned portions, as well as damage to bridges in the condemned portion.

At the conclusion of the trial the court held that the cessation of the operation of trains by the defendants was not vol-

untary within the meaning of the law, but "that it was impossible to operate the trains because of the damage to the portion of the uncondemned track as well as damage to certain bridges within the condemned area." In the concluding paragraph of the opinion the court said:

"Therefore, the court is entering an order today denying the preliminary injunction and, because of the facts disclosed by the testimony of witnesses and the exhibits, further action on the application for a permanent injunction will be postponed until the Interstate Commerce Commission has had an opportunity to act on the application of the defendant railway company for a certificate of convenience and necessity authorizing the abandonment of the remaining portion of the railroad."

Myers v. Arkansas & Ozarks Ry. Corp., (W.D.Ark.1960) 185 F.Supp. 36.

On April 12, 1961, the court sua sponte entered an order directing that the case proceed to trial on the issue of just compensation without regard to interventions, "and as if said defendant, Arkansas & Ozarks Railway Corporation, owned the fee simple title to all its right of way." That the issues arising on the interventions of persons claiming to own the real estate comprising the right of way or reversion thereto be held in abeyance and tried at a later time upon proper motion for distribution or apportionment of any award of just compensation.

The order further provided that if the railway contends that Act 62 of the 1961 Acts of Arkansas affects the amount of just compensation, that it proceed to file a memorandum with respect thereto.

The order also required the State of Arkansas to file its memorandum respecting the constitutionality and applicability of said Act 62, and also that the plaintiffs file brief on the question of the constitutionality and applicability of said Act. Briefs on the constitutionality of said Act were submitted, but the court deferred a decision thereon pending a decision by the Supreme Court of Arkansas on the constitutionality of the Act, and on May 21, 1962, the Act was held unconstitutional. See, Arkansas Commerce Commission v. Arkansas & Ozarks Railway Corp., 235 Ark. 89, 357 S.W.2d 295.

The historical facts set forth above are not complete, but they are sufficient to show the tortuous course of the instant case since it was commenced on January 19, 1959.

It will be remembered that the court in an effort to aid the parties in establishing the amount of just compensation had filed its opinion on December 3, 1959, in United States v. 27.7 Acres of Land, More or Less, in Carroll County, Arkansas, and Arkansas & Ozarks Railway Corp. et al., D.C., 178 F.Supp. 712, in which the court at page 718 said:

"In the instant case, since a portion of the railroad has been taken, the railway corporation is entitled to recover the market value of the part taken together with damages for the depreciation, if any, of the remainder of the railroad. In such a situation as is here presented the measure of just compensation for the physical property taken is the difference between the market value of the entire line of railroad immediately before the taking and the market value of the portion that remains after the taking."

Also, at page 719 the court held:

" * * * Therefore, since the plaintiff has taken a part of the physical assets of the railway corporation, the plaintiff should pay it the market value of the part taken, together with damage to the part not taken, plus the value of its franchise or operating rights, if any."

The case came on for trial on February 12, 1963, and because of the paucity of the evidence, the court at the conclusion of the trial requested the parties to submit memorandums embracing the elements which they believed the court should consider in determining just compensation.

The memorandum submitted by the railway states that it should recover the sum of $3,000.00 as the fair market value of the land owned by the defendant situated in the Town of Beaver, and being a strip 1,550 feet in length, extending from the west end of the railroad bridge located in the narrows at Beaver, Arkansas, to the east end of Poker Bluff. The strip is 100 feet wide except for 50 feet at the spring house where it is 70 feet wide. There is a total of about 3½ to 4 acres of land, of which about 1½ acres are level and situated in the Town of Beaver at an elevation of 920 to 940 feet.

In addition to the claim for the market value of the real estate, the railway contends that it should recover special damages in the sum of $73,000.00 because of the extra cost to the railway in salvaging the ties, the rails, switch stands, fish plates, etc. Also, that if the court requires the railway to remove the bridge across White River at Beaver an additional sum of "$85,000.00 should be allowed it, but that if the court holds that the railway is under no duty to remove the bridges, then the question of the cost of removal is immaterial and irrelevant."

The plaintiff contends that the railway is only entitled to recover the market value of the real property above referred to. It does not contend that William L. Neis and wife should not be awarded the market value of the right of way in which they held a reversionary title consisting of 7.87 acres.

The railway does not contend that it is entitled to recover for any other land in the condemned area over which its right of way extended, presumably because the railway had only an easement thereon. The value of the real property owned by it, situated outside of the condemned area, apparently was not reduced and no claim for damages was asserted.

A witness for the railway testified that in his opinion the market value of the strip of land for which compensation is claimed by the railway was $3,000.00. A witness for the plaintiff testified that the land for which the railway claims compensation, together with the land the title to which reverted to Mr. and Mrs. Neis, was worth only $2,500.00.

The court believes that the land owned by the railway was worth considerably more per acre than the Neis land, and after considering the testimony of the witnesses and the location and condition of the land, the court believes that just compensation for the railway land was $3,000.00 and for the Neis land was $600.00.

The plaintiff did not acquire title to the rails, ties, fish plates, spikes, switch stands, and other property placed on the right of way which, from the nature of its construction, might be utilized at another site, and therefore the railway had a right if it chose to do so to remove such property. Hubbard v. Missouri Pac. R. Co., (E.D.Ark.1923) 288 F. 945; St. Louis-San Francisco Ry. Co. v. White, (1939) 199 Ark. 56, 132 S.W.2d 807; Baetjer v. Garzot, (1 Cir., 1943) 136 F.2d 453. The railway chose to remove the property rather than to sell it in place as salvage. Neither party offered any evidence to establish the market value of such property in place as salvage. Apparently both the plaintiff and the railway considered that since the property had been removed, the railway had no claim for salvage value, but the railway contends that because of the acts of the plaintiff, the cost of removing the rails, ties, etc., was increased by $73,-000.00.

Ordinarily evidence of loss of profits, the expense of relocation, and other such consequential losses are refused in federal condemnation proceedings. United States v. Petty Motor Co., supra, and cases cited therein. However, the court permitted a witness for the railway to testify over the objections of the plaintiff that additional costs were incurred by the railway in salvaging the property. The witness based his estimate of the additional costs upon the fact that because of the damage to the bridges and the track, it was prevented from using the ordinary and approved

methods in salvaging the property. However, it developed that when the bridges were destroyed and the dump and the tracks were washed out, the railway did have two locomotives at Harrison but had no gondola cars or other cars that could be used in removing the property from the right of way between Harrison and Eureka Springs, a distance of approximately 57 miles. There was approximately 9 miles of track lying west of Butler Creek and between the trestle thereon and the Town of Seligman, Missouri, which could have been salvaged by the use of a locomotive and railroad cars, but the same witness testified that it would have been uneconomical to remove the property from the 9-mile strip other than by truck since the cost of renting or leasing a locomotive and cars was prohibitive because of the short distance. The property between Harrison and Eureka Springs could not be removed by train since there was no way of getting any equipment from Seligman to Harrison because of the condition of the road caused by the May 6, 1960, flood.

Subsequent to the May 6, 1960, flood, the track from Leatherwood Creek west of Eureka Springs to near the east end of the condemned area was for all practical purposes completely useless, and the railway was unable to operate any trains from Harrison, Arkansas, to Seligman, Missouri. It is not claimed that the plaintiff was in anywise responsible for the washout of the track and bridges outside of the condemned area, but the railway contended that even had repairs been made to the bridges and track that were washed out, it would have been unsafe to have operated a train through the condemned area because of the weakening of a trestle or bridge across Butler Creek in the condemned area that was caused by a rise in the water of the reservoir which weakened the foundation of the mud sills upon which the timbers supporting the superstructure of the Butler Creek Bridge rested.

In order to remove rails, cross-ties, etc., the railway found itself in such a position that compelled it to remove by truck the salvage from its original location to various concentration points from which it was transported by truck to railheads, most of which went either to Bergman, Arkansas, on the Missouri Pacific, a distance of approximately 8 miles from Harrison, Arkansas, or to Seligman, Missouri, a distance of approximately 11 miles from Beaver, Arkansas.

The railway did not undertake to remove the rails, cross-ties, etc., until January, 1962, and completed the removal in August of that year, notwithstanding the Interstate Commerce Commission had granted the defendant the right to abandon the railroad and remove the property on April 7, 1961. Thus approximately eight months passed after the right to remove the property had accrued before the railway commenced to remove it.

No evidence was introduced as to the value of the salvage in place or when removed. The only evidence introduced in that respect was that the total cost of salvaging the road was $106,043.04, plus $41,816.00 for rental of equipment.

■ If in fact the expense of removing the salvage was increased because of the method which the railway used, such loss was not caused by the condemnation and taking of the 2.064 miles of track which the railway continued to use from the date of the commencement of the proceeding on January 19, 1959, until May 6, 1960. The officials of the railway well knew the condition of the track and knew that the track extending across Leatherwood Creek and westward to the east end of the condemned area was susceptible to disastrous overflows from the waters rushing down from the mountains into Leatherwood and other creeks in the area, and they likewise knew that if such heavy rains occurred, the cost of repairs would be large and not justified in view of the fact that the railway was losing money and it would soon be compelled to ask the Interstate Commerce Commission for authority to abandon the railroad.

■■ Ordinarily the railway would be entitled to recover severance damages

in addition to the value of the physical property taken, and the value of its franchise, if any, but there was no evidence introduced to establish the market value of the entire line prior to the commencement of the condemnation proceedings; the value of the remainder after the taking of the 2.064 miles of the right of way; or reduction in value of the franchise. In all probability such evidence was not available, because at the time of the commencement of the instant proceeding the railway was constantly losing money. In fact, the court in D.C., 178 F.Supp. 712 found that after the taking there was approximately 9 miles of trackage extending from the north or west sides of the reservoir to Seligman, Missouri, and approximately 57 miles of trackage extending from the south or east sides of the reservoir through the Towns of Eureka Springs, Berryville, and Green Forest to Harrison. At that time the property had no market value except for salvage purposes.

At page 718 of 178 F.Supp. this court stated:

> "The facts reflected in the documents filed by the railway corporation establish beyond a doubt that the operation of the railroad had proved to be a failure prior to the filing of the complaint, and, as stated in Roberts v. City of New York, 1935, 295 U.S. 264, at page 282, 55 S.Ct. 689, at page 693, 79 L.Ed. 1429, 'substantial prices are not paid for the privilege of conducting a business at a loss.' "

The plaintiff contends that the value of the property should be determined as of the date of the filing of the declaration of taking on April 28, 1961, at which time a deposit of estimated just compensation was made. The court does not believe that the filing of a declaration of taking invariably fixes the date of the taking. Section 1 of the Act of February 26, 1931, 46 Stat. 1421, 40 U.S.C. § 258a, provides that upon the filing of a declaration of taking and of the deposit in the court to the use of the persons entitled thereto of the amount of estimated compensation as set forth in the declaration, "title to the said lands in fee simple absolute, or such less estate or interest therein as is specified in said declaration, shall vest in the United States of America, and said lands shall be deemed to be condemned and taken for the use of the United States, and the right to just compensation for the same shall vest in the persons entitled thereto; * * *." Notwithstanding the provisions of the statute, if the Government enters into physical possession of the property, the date of such entry fixes the date of taking for the purpose of ascertaining just compensation. United States v. Dow, (1958), 357 U.S. 17, 78 S.Ct. 1039, 2 L.Ed.2d 1109. The order for delivery of possession entered January 22, 1959, did not, in the opinion of the court, vest title in the plaintiff. It was a general order, but the order also provided that "the defendant, Arkansas & Ozarks Railway Corporation, may continue to use the said property at its own risk to the extent and for such time as its use does not interfere with the possession and use of the plaintiff."

The order may appear to be a hybrid in that it, in effect, ordered possession to be delivered to the plaintiff, but at the same time permitted the railway to retain possession and use the property until it became necessary for the plaintiff to use the property in the operation of the Table Rock Dam. Often in cases where large areas are condemned for reservoir purposes, the courts permit property owners to retain possession of the property until the rise of impounded waters makes it necessary that they vacate when such possession on the part of the property owner does not in anywise interfere with the construction of the dam.

It is difficult to understand why the owners of the railway desired to continue to operate the railroad from Harrison, Arkansas, to Seligman, Missouri, when they knew that they had lost on an average during the last five years $30,746.00 per year. At that time the only source of income was from interstate freight which was delivered to the railway by the

Frisco at Seligman, Missouri, for delivery to consignees in the four towns in Arkansas, and in the reverse the interstate shipments consigned from the four towns in Arkansas to Seligman, Missouri, or points beyond Seligman located on other railroads. But the railway continued to operate until the flood of May 6, 1960, when it was compelled to cease operation and authorization for abandonment in due time followed. In fact, the order authorizing the abandonment of the railroad was issued by the Interstate Commerce Commission on April 7, 1961, and 21 days later, April 28, 1961, the declaration of taking was filed. Certainly at the time the declaration of taking was filed the only value of the railway to its owners was that for salvage purposes. The railway had been in possession of the entire line until it was forced to abandon because of the flood on May 6, 1960, and the court believes that if it were necessary to determine a date for the ascertainment of market value, the date should be fixed as the date of the filing of the declaration of taking, April 28, 1961, but the court is of the opinion that it is immaterial whether the date for the ascertainment of just compensation be fixed as of January 22, 1959, or April 28, 1961, because under the facts the result would be the same.

In the many conferences between the court and the attorneys for the parties during the pendency of this proceeding, it was strongly intimated by the attorney for the plaintiff that plaintiff considered the bridge across White River to be personal property and that the railway should be required to remove the bridge from the river. The testimony adduced by the railway at the trial established that it would cost approximately $85,-000.00 to remove the piers from the river and the superstructure attached to the piers, and the railway contended that if the court should hold that the plaintiff did not obtain title to the bridge, including the piers and the superstructure that were securely and permanently attached thereto, that it should recover from the plaintiff a sum sufficient to cover the cost

of the removal of the bridge. The plaintiff has called the attention of the court to Anderson v. Hobbs Tie & Timber Co., (1938) 196 Ark. 805, 120 S.W.2d 158, as an authority establishing that the bridge across the river was in fact personal property, and that the plaintiff did not acquire title to it by filing the declaration of taking. The court does not believe that the holding in the cited case is applicable to the instant case because of the substantial difference in the material facts, and the court is of the opinion that the railroad bridge, including the piers and the superstructure permanently attached thereto, was real property and was acquired by the plaintiff and that no duty devolves upon the railway to remove the bridge from the river.

A predecessor of the railway obtained fee title to the land upon which the bridge was built. The deeds, which were introduced in evidence as defendant's Exhibits 13 and 14, are statutory warranty deeds, and by the terms of each deed a fee simple title was conveyed. There is nothing in either deed indicating an intent on the part of the grantors to exclude from the demised premises any structures or construction required by the railway; and, conversely, nothing appears evidencing a purpose by the grantors to retain as a part of the realty anything placed thereon for railway purposes. Therefore, the court is of the opinion that the title to the bridge across White River was obtained by the plaintiff and that there is no obligation on the part of the railway to remove the structure or any part thereof. See, St. Louis-San Francisco Ry. Co. v. White, supra; and Hubbard v. Missouri Pac. R. Co., supra.

Having reached this conclusion relative to the White River Bridge, it is not necessary for the court to further consider the cost of the removal of the bridge.

The court is convinced that an award of $3,000.00 as just compensation to the railway is ample and is all that is supported by the evidence, and that an award of $600.00 to the defendants, William L. Neis and wife, as just compensation is

ample and all that is justified by the evidence.

Judgment is being entered today in accordance with the above, fixing the compensation to be paid to the defendant, Arkansas & Ozarks Railway Corporation, at $3,000.00, and to the defendants, William L. Neis and wife, at $600.00.