**INTERSTATE COMMERCE COMMISSION, Plaintiff,**

**Vermont Public Service Board, Intervening Plaintiff,**

v.

**ST. JOHNSBURY AND LAMOILLE COUNTY RAILROAD and S. M. Pinsly.**

**Civ. A. No. 73-3.**

United States District Court, D. Vermont.

Feb. 1, 1973.

John J. Mahoney, Interstate Commerce Comm., Washington, D.C., Averill Laundon, Gen. Counsel, Public Service Bd., Montpelier, Vt., for plaintiffs.

G. Clark Cummings, Kelley, Drye, Warren, Clark, Carr & Ellis, New York City, Ryan, Smith & Carbine, Rutland, Vt., John H. Downs, St. Johnsbury, Vt., for defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

HOLDEN, Chief Judge.

Plaintiffs seek an injunction ordering the defendants to comply with 49 U.S.C. § 1(18).[1] This provision of the Interstate Commerce Act forbids a railroad subject to federal regulation from abandoning operations without first having obtained a certificate of public convenience and necessity from the Interstate Commerce Commission. The I.C.C. initiated this action by seeking an injunction pursuant to 49 U.S.C. § 1(20),[2] enjoining the St. Johnsbury & Lamoille County Railroad and S. M. Pinsly, the railroad's president and chief operating officer, from effecting an unauthorized abandonment. The petition of the Vermont Public Service Board to intervene as a plaintiff was granted. Hearing was held on January 22, 1973, on the application for preliminary injunctive relief. After commencement of the hearing, trial of the action on the merits was advanced and consolidated with the hearing on the application, as provided in Rule 65(a)(2), Fed.R.Civ.P.

### FINDINGS OF FACT

1. The St. Johnsbury & Lamoille County Railroad filed an application for

---

1. 49 U.S.C. § 1(18) provides in pertinent part: ". . . no carrier by railroad subject to this chapter shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity permit of such abandonment . . . ."

2. 49 U.S.C. § 1(20) provides in part: ". . . Any construction, operation, or abandonment contrary to the provisions of this paragraph or of paragraph (18) or (19) of this section may be enjoined by any court of competent jurisdiction at the suit of the United States, the Commission, any commission or regulating body of the State or States affected, or any party in interest . . . ."

abandonment with the Interstate Commerce Commission on November 7, 1972. Without awaiting decision by that agency, the railroad ceased to render service on November 27, 1972. The railroad accomplished this by publishing on November 20, 1972, an embargo effective on that date with respect to inbound traffic, and effective November 27 with respect to outbound traffic. On December 6, 1972, the Interstate Commerce Commission ordered this embargo cancelled and published an embargo order of its own of similar scope, banning rail traffic over the St. Johnsbury & Lamoille County Railroad until March 31, 1973, unless otherwise modified. Agents of the commission conducted an investigation of the circumstances surrounding the embargo in the latter part of December, 1972.

2. The justification offered by the railroad for the imposition of the embargo is that unsafe track conditions make rail traffic hazardous. In 1972, there were 37 derailments on the railroad's approximately 100 miles of track. As of October 26, 1972, one-third of the track was in good condition; one-third was in fair condition; and one-third was in poor condition.

3. The cause of the unsafe road condition is the failure of the railroad to properly maintain the roadway. The numerous derailments resulted from conditions of track geometry within the control of the railroad. Ties in poor condition, rail spreading, and inadequate ballast all contributed to the derailments. While most of the derailments did not cause significant damage, on November 18, 1972, a train transporting an electric generator valued at $900,000 was derailed and became uncoupled from the engine, causing the cargo to enter the Lamoille River. None of the derailments resulted in personal injuries to the railroad crews involved.

4. While rehabilitation of the railroad to a condition which would allow traffic to operate at speeds of 25 miles per hour could cost between $1 million and $2 million, it would cost considerably less to make the railroad safe for operation at speeds up to ten miles per hour.[3] A temporary work force of 24–32 men in addition to the railroad's normal complement of employees should be sufficient to open the railroad and repair it to permit traffic to proceed at a rate of ten miles per hour.[4] Given the necessary personnel and equipment, the railroad can be made operational through temporary repairs, including snow removal, within two weeks.

5. The railroad has no present intention to resume service pending disposition of its petition to abandon.[5] It has made no efforts to repair or keep the tracks free from snow since cessation of operations at the time of the embargo. It laid off the majority of its employees in December, 1972.[6] There is no evidence to indicate that it has sought state assistance in maintaining operations.[7] The railroad made no efforts during the

---

3. On October 20, 1972, the railroad informed the Vermont Public Service Board that the railroad would be able to remain open through the winter by making temporary repairs at a cost of $35,000 to $40,000.

4. On December 6, 1972, three engineers of the railroad stated that at that time the track would sustain traffic safely at ten miles per hour. Other than an accumulation of ice and snow, the roadbed has sustained no substantial change since the railroad halted operations on November 27, 1972.

5. Officials of the railroad maintained discussion with the chairman of the Vermont Public Service Board concerning the continuance of operation through the winter of 1972–73. After the derailment of November 18, all effort in this respect in cooperation with the Public Service Board ceased.

6. On November 1, 1972, the railroad employed 40 maintenance personnel. On January 22, 1973, it employed three.

7. On November 16, 1972, defendant Pinsly, president of the railroad, acknowledged that he was not interested in financial assistance in the form of a guaranteed loan from the state of Vermont.

fall of 1972 to repair and make ready a snow plow for the coming winter.

6. Cessation of operations by the railroad would have a substantial and adverse impact on northern Vermont.[8]

## CONCLUSIONS OF LAW

■ The defendants challenge the court's jurisdiction of this action. They insist that the issue here is the legality of the embargo, and that such a question is committed to the administrative jurisdiction of the Interstate Commerce Commission. This argument is without merit. This court has jurisdiction of cases arising under the laws of the United States. The Interstate Commerce Act prohibits the unauthorized abandonment of operations by a regulated railroad. 49 U.S.C. § 1(18). The act confers authority on this court at the suit of the Commission, the intervening Public Service Board, or any party in interest to enjoin such an abandonment. 49 U.S.C. § 1(20); Powell v. United States, 300 U.S. 276, 287, 57 S.Ct. 470, 81 L.Ed. 643 (1936); I.C.C. v. Memphis Union Station Company et al., 360 F.2d 44 (6th Cir. 1966), cert. denied, 385 U.S. 830, 87 S.Ct. 66, 17 L.Ed.2d 66.

■ The railroad has abandoned operations within the meaning of 49 U.S.C. § 1(18). Under the act, there is no distinction between discontinuing a service permanently and suspending operations indefinitely. Meyers v. Jay Street Connecting Railroad, 259 F.2d 532 (2d Cir. 1958). Cessation of operations by the railroad without intent to restore service constitutes, at the least, an indefinite suspension. Implicit in Jay Street is the proposition that the embargo procedure, as instituted by the defendants here and supplemented by the Commission, cannot serve as a substitute for the orderly abandonment procedure prescribed by 49 U.S.C. § 1.

■■ Considerations of equity favor the plaintiffs in this action, despite the pendency of the railroad's petition for abandonment. The railroad is a factor of great importance in the area it serves. It is of importance to the businesses of the area and to their employees, whose livelihood ultimately depends on deliveries by their employers. The railroad terminated operations abruptly, without warning to the shippers who have long depended on it. Many have been unable to make alternate shipping arrangements which are financially satisfactory. Although the State of Vermont through its Public Service Board and others has expressed a deep concern to restore defendants' rail service, there is no indication that the railroad has explored the possibility of obtaining assistance from the State or elsewhere to remain open while its abandonment petition is pending.

More importantly, the railroad is directly responsible for the track conditions upon which it premised its embargo. This is not a situation in which a roadway has been damaged by a natural disaster, as in Myers v. Arkansas & Ozarks Railway Corp., 185 F.Supp. 36 (W.D.Ark.1960). The need for an embargo could have been avoided by defendants' performance of adequate maintenance and establishment of a moderate reconstruction program. Neglect of these duties by the railroad's responsible officers affords no legal justification for the defendants to relinquish their public trust and abandon the line to the weather.[9] If interference with its serv-

---

8. According to a survey conducted by the Vermont Agency of Development and Community Affairs, three plants serviced by the railroad would close, resulting in a loss of 160 jobs with an annual payroll of $1,250,800. Shippers remaining open would incur increased transportation costs as a result of the need to use trucks, causing a five to ten percent rise in the retail prices of the affected items. Cessation of railroad operations would impose additional "chain reaction" costs on the State of Vermont, such as increased unemployment compensation payments and increased highway maintenance expenditures.

9. Defendant railroad's vice-president and general manager testified in substance that

ice could have been avoided by forethought, a railroad will not be excused from failing to fulfill its obligation to deliver all goods offered to it for transportation. *Johnson v. Chicago, Milwaukee, St. Paul & Pacific R. Co.*, 400 F.2d 968 (9th Cir. 1968).

Nor is this a case in which the cost of the needed repairs outweighs the need for a railway's services during the pendency of an abandonment petition, as in *Asbury v. Chesapeake & Ohio Railway Co.*, 264 F.Supp. 437 (D.C.1967). In that case, the court denied a request to order a railroad to repair a tunnel, during the pendency of a decision by the I.C.C. on an abandonment petition on which a hearing had already been held. Here, the potential loss to the Vermont communities served by the railroad far exceeds the probable cost of the temporary repairs needed to keep the railroad open until the I.C.C. has acted on the railroad's petition.

■ It is not for the court to determine whether the present or future public convenience and necessity permit the abandonment which the defendants have proposed in their application to the Interstate Commerce Commission. That is the particular responsibility of that administrative agency. It is the court's function under the Interstate Commerce Act to enjoin the unilateral abandonment of railroad service until the application to abandon has been adjudicated by the Commission. *Meyers v. Jay Street Connecting Railroad*, supra, 259 F.2d at 534–35.

In view of the facts and circumstances presented in the record, it is the obligation of the Interstate Commerce Commission to adjudicate the merits of the defendants' application as promptly and efficiently as its burdened agenda will allow.

snow has not been removed because the railroad is not operating and that deferred maintenance cannot be performed because of weather conditions. Adequate personnel and material are at hand in the area of defendants' responsibility to accomplish deferred

Since the plaintiffs have established the defendants to be in violation of 49 U.S.C. § 1(18), an order for injunctive relief will issue accordingly.

Dated at Rutland, in the District of Vermont, this 31st day of January, 1973.

snow removal and maintenance operations. Competent and experienced railroad experts testified that the road can become operational within two weeks and trains can be safely operated at speeds of ten miles per hour.