**INTERSTATE COMMERCE COMMIS-SION, Appellant,**

**v.**

**CHICAGO, ROCK ISLAND AND PACIF-IC RAILROAD COMPANY,**
**Appellee.**

**No. 73–1920.**

United States Court of Appeals, Eighth Circuit.

Submitted May 14, 1974.

Decided July 24, 1974.

Rehearing and Rehearing En Banc Denied Aug. 27, 1974.

Lawrence W. Chamblee, Atty., Interstate Commerce Commission, Washington, D. C., for appellant.

Kenneth C. Stephan, Knudsen, Berkheimer, Endacott & Beam, Lincoln, Neb., for appellee.

Before GIBSON and WEBSTER, Circuit Judges, and WILLIAMS, District Judge*.

GIBSON, Circuit Judge.

This litigation might be considered another chapter in the saga of the vanishing American railroads. Due to an abandonment of approximately 39 miles of track by the Chicago, Rock Island and Pacific Railroad Company (the Rock Island), the residents of Gladstone, Gilead, Hebron, Deshler and Ruskin, Nebraska, no longer have to "stop, look, and listen" before crossing the Rock Island's Ruskin line. More importantly in terms of the statutory scheme embodied in the Interstate Commerce Act,[1] shippers have been forced to turn to alternate methods of transporting goods due to the abandonment of rail service. However, in this proceeding we are not called upon to determine the merits of the abandonment application pending before the Interstate Commerce Commission (ICC), but rather must determine where the proper means of redress lies for an unauthorized abandonment of lines subject to the jurisdiction of the ICC.

The Congressional scheme is set forth in 49 U.S.C. § 1. Section 1(18) provides in pertinent part:

[N]o carrier by railroad subject to this chapter shall abandon all or any portion of a line of railroad, or the operation thereof, *unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity permit of such abandonment.* (emphasis supplied).

Section 1(20) further provides:

The Commission shall have power to issue such certificate as prayed for, or to refuse to issue it * * * and may attach to the issuance of the certificate such terms and conditions as in its judgment the public convenience and necessity may require. *From and after issuance of such certificate, and not before,* the carrier by railroad may * * * proceed with the * * * abandonment covered thereby. Any * * * abandonment contrary to the provisions of this paragraph or of paragraph (18) or (19) of this section *may be enjoined by any court of competent jurisdiction* at the suit of * * * the Commission * * *. (emphasis supplied).

The ICC and the Nebraska Public Service Commission brought suits pursuant to 49 U.S.C. § 1(20) for an injunction compelling the Rock Island to restore service on its Ruskin line. After a hearing on the consolidated actions, the District Court refused to enjoin the abandonment; instead it ordered dismissal of the actions. The court felt that the ICC should exercise primary jurisdiction in the matter because its special expertise would allow it to resolve the issues of the effect of abandonment on the Rock Island, the probable cost of restoration of service, the financial ability of the Rock Island to bear

---

* The Honorable Paul X Williams, United States District Judge for the Western District of Arkansas, sitting by designation.

1. 49 U.S.C. § 1 *et seq.*

the cost of restoration, and what effect the outlay of funds on the Ruskin line would have on service to shippers in other parts of the country—in short, those issues relative to the merits of the Rock Island's abandonment application. The ICC appeals the dismissal of its complaint, arguing that the doctrine of primary jurisdiction does not apply.[2] Before proceeding to the legal issues presented, a detailing of the relevant facts will be helpful in understanding the issues.

▆▆▆ The controversy took form March 2, 1973, when the Rock Island issued an "embargo", a notice to patrons on the line that service would be terminated because of poor track conditions. An "embargo" issued by a common carrier is an emergency measure used when for some reason the carrier is unable to perform its duty as a common carrier. Froehling Supply Co. v. United States, 194 F.2d 637, 641 (7th Cir. 1952). If justified, an embargo serves to relieve the carrier of its liability for failing to provide transportation. See 49 U.S.C. § 1(4) (Duty to furnish transportation); 49 U.S.C. § 8 (Liability of carriers for damages).

Suit by the Nebraska Public Service Commission was filed May 5, 1973, seeking to enjoin "abandonment"; the Rock Island's application for abandonment was filed with the ICC May 21, 1973; and the instant suit was filed August 22, 1973, and consolidated with the prior Public Service Commission action.

▆▆ The threshold question for the District Court's determination was whether an abandonment had occurred. If the cessation of operations continued because of conditions over which the Rock Island had no control, no abandonment within the meaning of 49 U.S.C. § 1(18) would be established. Zirn v. Hanover Bank, 215 F.2d 63, 69 (2d Cir. 1954); Myers v. Arkansas & O. Ry., 185 F.Supp. 36, 41 (W.D.Ark.1960).

▆▆ Abandonment, unlike an embargo, implies an intention to indefinitely or permanently cease all service. Meyers v. Jay Street Connecting R. R., 259 F.2d 532, 535 (2d Cir. 1958); Wheeling & L. E. Ry. v. Pittsburgh & W. V. Ry., 33 F.2d 390, 392 (6th Cir. 1929). Factually, determination of the question revolves around the intent of the railroad; cessation of service for lack of physical equipment has been determined not to be an abandonment, Zirn v. Hanover Bank, *supra*, as has the impossibility of operation due to flood damage to tracks and railway bridges. Myers v. Arkansas & O. Ry., *supra*.

Here there is no difficult question of fact as to whether an abandonment occurred. The District Court determined there was an abandonment in May or June, 1973, when weather conditions would have allowed track restoration. The Rock Island admitted on oral argument that there was a "technical" abandonment in June, 1973. The Rock Island maintains that an unusual winter and spring, marked by abnormal precipitation and temperature fluctuation, caused the softening of the roadbed and deterioration of ties to the extent it was no longer safe to run a train on this line. This must be considered a matter of degree, as the fact that 50 derailments occurred on this line from February, 1971, through January, 1973, could have led to a conclusion that the line was no longer safe prior to March 2, 1973.

The Commission admits the impossibility of operation over the Ruskin line in March, 1973. However, it asserts that these weather conditions would not have necessitated abandonment of operations had the railroad not consciously withheld essential maintenance from the line over the preceding years. The record shows that the Rock Island had been looking for a way to abandon the line since at least October, 1970. Because it could foresee no success with an

---

**2.** The Nebraska Public Service Commission did not appeal the dismissal of its suit by the District Court.

abandonment petition before the Commission, it considered itself to be in a dilemma. The Ruskin line has continually shown a profit. The Rock Island felt that the cost of performing essential rehabilitation on the line would not be warranted by the revenue it produced. If the Rock Island did rehabilitate the line, it would be able to show an operating loss and thereby improve its chances of having abandonment approved. If it did not rehabilitate the line, it would continue to show a profit, thus decreasing the chances on its abandonment petition. Opting for the short run profit until the Rock Island's management determined the time was auspicious for approval of its planned abandonment application, the matter continued to be much debated from October, 1970, to March, 1973, when the railroad was spared any further debate by the unusual weather conditions which finally put the track out of service.

The Commission's view that the track would not have become impassable in March, 1973, except for the Rock Island's failure to perform essential maintenance finds support in the record. Minutes of a November 27, 1970, Branch Line Committee meeting indicate that the Ruskin line was even then in "deplorable condition." A memo from W. C. Hoenig, General Manager of the Kansas City, Kansas, operating department to R. J. Lane, Senior Operating Assistant of the Rock Island, dated March 24, 1971, stated: "Almost every trip made on the Ruskin line involved one or more derailments, and we are rapidly reaching a point of cessation of service unless a general rehabilitation program is established." June 4, 1971, Mr. Lane wrote "the physical condition of the line is probably the worst on the system." He further acknowledged that there was no alternative but abandonment or rehabilitation of the line. However. Mr. Dixon, President of the Rock Island, determined prior to June 29, 1971, that abandonment should not be pursued, nor rehabilitation begun, but rather suggested spending "the minimum amount neces-

sary to make the branch passable and keeping it in a minimal safe operating condition."

This apparently was a continuation of the Rock Island policy of many years. Mr. Lane wrote in February, 1973, that "one of the principal reasons it has shown a profit is the fact that we have, for years, performed an *absolute minimum* of maintenance on the line." (emphasis supplied). However, taking Mr. Dixon's suggestion to heart, the Rock Island managed to further reduce maintenance expenditures on the Ruskin line from $84,828 in 1971 to $48,289 in 1972. And the testimony at the hearing revealed that at least 50% of the maintenance expenditures on the Ruskin line went not to improve the "deplorable condition" of the line but to fix the numerous derailments. With this factual background in mind we turn now to the legal issues presented for our review.

■ Although the District Court felt an unlawful abandonment had occurred, it determined that the suit should be dismissed so that the ICC could exercise primary jurisdiction in the matter. We think this determination was a clear error of law. The doctrine of primary jurisdiction has no application in this proceeding.

The challenge instituted is expressly authorized by the Interstate Commerce Act without mention of any prior resort to ICC administrative proceedings. The fact that suit may be maintained at the instance of the Commission is a strong indication that such matters are properly determined by the court. Indeed, the Supreme Court has stated in regard to suits under § 1(20):

Upon presentation by the carrier of application for a certificate, the commission, for the purpose of determining whether it is authorized by the act to consider the merits, may pass incidentally upon the question whether the project is one covered by section 1(18). *But the decision of that question is for the court in either a suit to set aside an order granting a certifi-*

*cate or in a suit under section 1(20) to enjoin a violation of section 1(18). \* \* \* That paragraph [§ 1(20)] provides the only method for enforcing section 1(18).*

Powell v. United States, 300 U.S. 276, 287, 57 S.Ct. 470, 476, 81 L.Ed. 643 (1937) (emphasis supplied).

Secondly, absent the express provision of the statute requiring the district court to exercise its jurisdiction, the rationale of primary jurisdiction has no application to the facts of this case.[3] We have had occasion to recently consider the doctrine of primary jurisdiction. See Izaak Walton League v. St. Clair, 497 F.2d 849 (8th Cir., 1974). Therein we stated, quoting from United States v. Western Pac. R. R., 352 U.S. 59, 63–64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956):

" 'Primary jurisdiction,' \* \* \* applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues, which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views."

Here, there are no issues requiring the views of the administrative agency. The concerns expressed by the District Court to justify application of the doctrine of primary jurisdiction relate to the merits of the pending abandonment application. An action under § 1(20) to enjoin abandonment concerns the maintenance of the procedural integrity of the processes provided in the Interstate Commerce Act and is not an action in which the court may concern itself with the merits of the railroad's abandonment application.[4] The only question for resolution is whether there has been an abandonment within the intendment of § 1(18). This is a legal question for the courts to determine. Wheeling & L. E. Ry. v. Pittsburgh & W. V. Ry., supra, 33 F.2d at 393. See also Meyers v. Jay Street Connecting R. R., supra; Pennsylvania v. Penn Central Transportation Co., 348 F.Supp. 28 (M. D.Pa.1972), aff'd, 475 F.2d 1394 (3d Cir. 1973); Asbury v. Chesapeake & O. Ry., 264 F.Supp. 437 (D.D.C.1967); Myers v. Arkansas & O. Ry., supra, wherein the courts proceeded to determine the abandonment issue without resort to the Commission.

Here, without denoting it as a finding, the District Court stated, "I am inclined to the view that there has been an unlawful abandonment." We emphasize that the question before the District Court does not concern the merits of the abandonment application—this is a matter for the ICC—but merely the narrow issue of whether an abandonment has occurred. Once this question is resolved with a finding of abandonment, the District Court then must proceed to deter-

---

3. According to Professor Davis, the doctrine of primary jurisdiction received its first formulation in Texas & Pacific R. R. v. Abilene Cotton Oil Co., 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907). 3 K. Davis, Administrative Law Treatise § 19.02 (1958). There it was held the reasonableness of rates must first be determined by the Interstate Commerce Commission. The courts are not strangers to the doctrine of primary jurisdiction as it affects railway cases. See cases collected in Great Northern Ry. v. Merchants Elev. Co., 259 U.S. 285, 295 n. 1, 42 S.Ct. 477, 66 L.Ed. 943 (1922). Mr. Justice Brandeis formulated the doctrine's application to ICC cases as follows:

Whenever a rate, rule or practice is attacked as unreasonable or as unjustly discriminatory, there must be preliminary resort to the Commission. Sometimes this is required because the function being exercised is in its nature administrative in contradistinction to judicial. *But ordinarily the determining factor is not the character of the function, but the nature of the controverted question and the nature of the inquiry necessary for its solution.* Great Northern Ry. v. Merchants Elev. Co., supra at 291, 42 S.Ct. at 479 (emphasis supplied).

4. This is not to say that those factors which enter into a decision on the merits of an abandonment application may not be considered by the district court in deciding whether an injunction should issue.

mine whether an injunction should issue. The record before us admits of no finding but that an illegal abandonment has occurred; whether it be May or June, 1973,[5] is immaterial for the purposes of this case. We therefore must reverse the decision of the District Court dismissing the complaint on grounds of primary jurisdiction.

We will not on this appeal direct entry of an injunction compelling the Rock Island to restore service. This is a matter which should first be determined by the District Court, taking into consideration the factual circumstances of the case and the strong Congressional policy and substantial public interest in not permitting abandonment of railroad service without approval of the ICC was required by § 1(18) of the Interstate Commerce Act. As the complaint was dismissed due to application of the primary jurisdiction doctrine, the court made no more findings of fact than absolutely necessary so as not to interfere in any manner with the ICC proceedings. We think the District Court should have the opportunity to make factual findings and determine in the first instance whether an injunction should issue.

■ Section 1(20) states that an illegal abandonment *"may* be enjoined by any court of competent jurisdiction." (our emphasis). This language implies the existence of discretion in determining whether an illegal abandonment should be enjoined. Ordinarily a reviewing court applies the principle that the grant or denial of an injunction will be reviewed only to determine whether there has been an abuse of discretion. Yakus v. United States, 321 U.S. 414, 440, 64 S.Ct. 660, 88 L.Ed. 834 (1944); Minnesota Public Interest Research Group v. Butz, 498 F.2d 1314 (8th Cir., 1974) (*en banc*; E. W. Bliss Co. v. Struthers-Dunn, Inc., 408 F.2d 1108, 1113 (8th Cir. 1969); 7 Moore's Federal Practice ¶ 65.04[2] (2d ed. 1974). The same standard would appear

applicable in the present case. We note the Supreme Court decisions in Thompson v. Texas Mexican Ry., 328 U.S. 134, 66 S.Ct. 937, 90 L.Ed. 1132 (1946) and Texas & P. Ry. v. Gulf, C. & S. F. Ry., 270 U.S. 266, 46 S.Ct. 263, 70 L.Ed. 578 (1926) contain language which arguably denies discretion to withhold an injunction once a violation of § 1(18) is found.

In *Thompson,* a trackage agreement which allowed one railroad to operate over the tracks of another expired. The Supreme Court held that operations over the track must continue until abandonment is authorized, even though there was no longer a contract right to do so. In *Texas & P. Ry.* the railroad attempted an extension of its tracks without authorization from the ICC, also a violation of § 1(18). In discussing a court's role upon application for injunction under § 1(20) the Court stated:

> The function of the court upon the application for an injunction is to construe the statutory provision and apply the provision as construed to the facts. The prohibition of paragraph 18 is absolute. If the proposed track is an extension and no certificate has been obtained, the party in interest opposing construction is entitled as of right to an injunction.

Texas & P. Ry. v. Gulf, C. & S. F. Ry., *supra* at 273, 46 S.Ct. at 264. In neither of these cases was the question of a physical impossibility of operation presented. In cases where a court has been confronted with a physical impossibility of operation without substantial expenditures for repair, the determination as to whether to issue an injunction has been viewed as one of equity, whether it would be equitable to require substantial expenditures when shortly thereafter the Commission may approve the railroad's abandonment application.

Thus, in Pennsylvania v. Penn Central Transportation Co., *supra,* an injunction was denied which would have required restoration of service on two branch

5. The Rock Island admitted to a "technical" abandonment of the line in June, 1973, when it says conditions would have permitted restoration of the line to service. The District Court viewed abandonment as occurring in May or June, 1973.

lines badly damaged by Tropical Storm Agnes at a cost found by the district court to be approximately $650,000. In Asbury v. Chesapeake & O. Ry., *supra,* an injunction was denied where the abandonment proceeding before the Commission was in its last stages, and restoration of service would have entailed repair of a tunnel at substantial cost. There is nothing in the reported decision indicating what necessitated the tunnel repair in *Asbury*. And in Myers v. Arkansas & O. Ry., *supra,* the court held there was no abandonment as the cessation of service was involuntary, being caused by severe rains and flooding which damaged the tracks and certain bridges lying within an area of property the United States had condemned and where the railway had no right to enter and make repairs.

The Commission argues that the above cases indicate only that the termination of service for reasons beyond the railroad's control [6] may justify the exercise of discretion in refusing an injunction, but that no case has allowed "abandonment by neglect," *i. e.,* permitting a railway by a deliberate neglect of essential maintenance which allows tracks to deteriorate to a "deplorable condition" to then successfully argue that restoration of service would be inequitably expensive. In such a case it is argued that the equities of the situation significantly favor the shippers on the line and require the issuance of an injunction. We would agree that this practice, if found by the District Court, would be a factor militating against the Rock Island's argument of conditions beyond its control necessitating termination of service.

The Commission further argues that the weak financial basis of the railroad does not afford a sufficient basis for denial of an injunction, citing Meyers v. Jay Street Connecting R. R., *supra*. In *Meyers* a preliminary injunction requiring the continuance of service was affirmed despite the fact the railroad had lost money for five years, had current liquid assets of only approximately $400, and in view of the undisputed fact of increasing larger monthly losses. The court noted that relief for the railroad lay in an application for reorganization under the Bankruptcy Act and stated:

> Unless they do so, and relief is denied to them, it is our opinion that the hardships imposed by the injunction do not outweigh the strong purpose of the Interstate Commerce Act to prohibit the abandonment of railway service without the approval of the ICC.

Meyers v. Jay Street Connecting R. R., *supra* 259 F.2d at 536.

Obviously the Rock Island must present a compelling financial case in light of the persistent profit shown by the Ruskin line, the railroad's own projections of increasing grain production in the area which would increase car traffic, and the statutory prohibition against unauthorized abandonment.

There is one related aspect of this case we find particularly disturbing. Service on this line was terminated March 2, 1973. An abandonment application was filed May 21, 1973. At oral argument we were informed the matter had not yet been docketed for a hearing and no estimate of when a final Commission decision will be rendered is available. One of the factors affecting the balancing of equities in *Penn Central Transportation Co., Asbury,* and *Myers,* was the fact that the abandonment proceedings before the Commission were expected to be resolved within a reasonable period of time, and thus while cessation of service was no doubt a burden on shippers during the interim, abandonment would either soon be authorized or denied. Where a Commission decision might soon be forthcoming authorizing abandonment, courts were justifiably reluctant to compel expenditures which in a few months could be seen to be wasteful or senseless. Here neither shippers nor this court can see

---

6. Noting that in *Asbury* there was no indication of the reason for the necessity of tunnel repair.

any prospect of resolution of the abandonment issue within the near future.

The effects of this inordinate delay are felt most directly by shippers who no longer can move their goods by rail, for most shippers the cheapest method of transportation. The increased cost of transportation will of course increase the cost of the goods and thereby indirectly affect consumers. Moreover, businesses left without rail transportation may be forced to close or relocate, directly affecting the economies of the cities and towns along the abandoned line.

The effect on the railroad may not be entirely beneficial either. In the short run they are spared the expense of maintaining the line. But until abandonment is authorized they are liable for damages resulting from breach of their duty to provide transportation, 49 U.S.C. § 1(4); Johnson v. Chicago, M. & St. P. R. R., 400 F.2d 968, 971–972 (9th Cir. 1968), and should abandonment not be authorized, the cost of restoration a few years hence may safely, though regretably, be assumed to be substantially higher than at present.

Finally, no doubt shippers and citizens of towns to be affected upon approval of an abandonment application receive the impression of a dereliction of duty on the part of the ICC when final resolution may be years in the future. It is frustrating and thoroughly regretable that the ICC could not in a matter of weeks determine whether or not this branch line should be abandoned, saving litigation expenses and more importantly giving a definitive answer to the future of the road. But no, our legal system is now so complex, so overburdened with contradictory requirements, that the system has almost ground to a halt.

■ The reason underlying this unreasonable delay is Congressional pyramiding of additional requirements on a system already enmeshed in bureaucratic delay. This disturbing situation is exacerbated by the application of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq., to railroad abandonment applications. See Harlem Valley Transportation Ass'n v. Stafford, 360 F.Supp. 1057 (S.D.N.Y. 1973), aff'd, 500 F.2d 328 (2d Cir., 1974); City of New York v. United States, 337 F.Supp. 150, 158–60 (E.D. N.Y.1972).

The decision of the district court in Harlem Valley requires the ICC to determine whether a particular abandonment is a "major Federal action significantly affecting the quality of the human environment" and if so, to prepare an impact statement for circulation to parties and use in the agency process. We were informed on oral argument that the ICC is presently attempting to assemble a staff, and based on the appellate decision in Harlem Valley (now decided against the ICC), would shortly begin work on the accumulated abandonment petitions, some 320 as of January, 1974. How long this process may take before this particular application reaches the hearing stage is unknown, but we can rest assured it will be considerable.

■ Such a delay in the determination of an abandonment application significantly affects the traditional balancing of equities upon application for injunction. The efficacy of the procedural process is called into question any time a railroad abandons a line without ICC approval in light of the clear statutory direction that service be maintained. However, as the district courts in Penn Central Transportation Co., Asbury, and Arkansas & O. Ry., determined, there are situations in which it would be inequitable to require restoration of service on a line where, caused through no fault of the railroad, the costs of restoration would be substantial, and the ICC could be expected to shortly determine whether abandonment would be authorized. We do not intend to intimate a feeling on the merits of an injunction in this particular case but merely are attempting to demonstrate the effects that the delay in agency processes caused by application of NEPA may have upon the discharge of that agency's statutory re-

sponsibilities in its field of expertise.[7] This is a matter which the courts, bound to apply the statutory mandates of both NEPA and the Interstate Commerce Act, cannot satisfactorily resolve. In view of the importance of rail transportation to the overall transportation needs of this country, we can only express a hope that Congress will recognize the difficulties created and attempt a satisfactory resolution.

Our reversal of the District Court's application of primary jurisdiction in this case compels a remand to the District Court to determine whether the injunction sought by the ICC should issue. We feel the District Court should have the initial opportunity to resolve the contested issues of fact in this record.

The judgment of the District Court dismissing the complaint is reversed and the cause remanded for further proceedings consistent with this opinion. We further express the hope that the ICC will undertake to give this abandonment proceeding speedy consideration consistent with the fulfillment of its statutory responsibilities.

---

7. Not an inconsequential part of the delay in the ICC processes lies not so much in the application of NEPA to abandonment applications but in the ICC's refusal to recognize that the NEPA requirements do apply. See Harlem Valley Transportation Ass'n v. Stafford, 500 F.2d 328, at 331–332 (2d Cir., filed June 18, 1974).