**In re AUTO–TRAIN CORPORATION, a Florida Corporation, Debtor.**

**Bankruptcy No. 80–00391.**

United States Bankruptcy Court, District of Columbia.

May 29, 1981.

Barry Dichter, Sandy Feldman, Washington, D. C., for trustee.

Murray Drabkin, trustee.

John O. B. Clarke, Washington, D. C., for Labor Union—Brotherhood of Railway & Airline Clerks, International Assoc. of Machinists and Aerospace Workers and the United Transportation Union.

## MEMORANDUM OPINION

ROGER M. WHELAN, Bankruptcy Judge.

(Motions by Intervenor Labor Organizations to Alter or to Amend Order Authorizing the Abandonment of Debtor, or in the Alternative, for a Stay Pending Appeal)

On April 24, 1981, this Court entered an order authorizing the cessation of Auto-

Train operations [1]. On May 4, 1981, the intervenor labor organizations, Brotherhood of Railway and Airline Clerks (BRAC), International Association of Machinists and Aerospace Workers (IAM), and the United Transportation Union (UTU) petitioned this Court "to alter or to amend order authorizing the abandonment of debtor, or in the alternative, for a stay pending appeal." (See Motion filed by Intervenors on May 4, 1981.) On May 26, 1981, this Court conducted a hearing in order to determine whether an abandonment within the intendment of 11 U.S.C. § 1170 [2] had occurred, and, if so, what labor protection, if any, should be granted to protect the interest of Auto-Train's union employees.

Intervenors maintain that the trustee's cessation of service constitutes an abandonment within the parameters of Section 1170, and, would accordingly mandate that the trustee file a proper application with the ICC in order that that agency may render an advisory report to the court with respect to such abandonment. 11 U.S.C. § 1170(b) & (c). In addition, the intervenors argue that 1170(e)(1) requires the imposition of employee benefits "at least as protective as those required by 49 U.S.C.

§ 11347." (See Memorandum of Intervenor Labor Organizations at 2, filed May 4, 1981.) Moreover, in the event that this Court denies the relief requested, intervenors request this Court to stay enforcement of the order pending an appeal pursuant to 11 U.S.C. § 1170(d)(1). The trustee argues, inter alia, that there has been no abandonment within the meaning of Section 1170 because "Auto-Train did not own a railroad line." (See Trustee's Memorandum in Opposition to Motion of Intervenor Labor Organizations at 3, filed May 22, 1981.) Accordingly, the trustee maintains the intervenors's motion should be denied.

The issues raised by the parties in the context of the pending railroad reorganization [3] are matters of first impression and raise substantial concerns for the union employees of Auto-Train, as well as for the trustee in connection with the administration of an estate under the new Chapter 11.

## I. FACTUAL BACKGROUND

On April 23, 1971, the Interstate Commerce Commission granted, pursuant to Section 1(18) of the Interstate Act, a certificate of public convenience and necessity

---

1. The trustee filed with this Court on April 24, 1981 two applications, i. e., (1) trustee's application for authority to cease operation and for the approval of settlement agreement and (2) application for leave to reject operating agreement between Auto-Train Corporation and Seaboard Coastline Railroad Company and Richmond, Fredericksburg & Potomac Railroad Company dated August 1, 1970. Notice was provided by the trustee to named parties in interest, including the Securities and Exchange Commission (SEC), the Interstate Commerce Commission (ICC), the Department of Transportation (DOT), as well as the intervenors. A hearing was conducted in open court on April 24, 1981, and evidence relating to the "cashlessness" of Auto-Train was adduced at that time and the court, in view of the emergent circumstances presented by the trustee, entered its order of April 24, 1981, authorizing the trustee to cease rail operations and to reject the underlying operating agreement then in effect between Auto-Train Corporation and Seaboard Coastline Railroad and Richmond, Fredericksburg & Potomac Railroad Company dated August 1, 1970.

2. Section 1170(a) in relevant part provides:

(a) The court, after notice and a hearing, may authorize the abandonment of a railroad line if such abandonment is—
(1)(A) In the best interest of the estate; or
(B) Essential to the formulation of a plan; and
(2) consistent with the public interest.
(b) If, except for the pendency of the case under this chapter, such abandonment would require approval by the Commission under a law of the United States, the trustee shall initiate an appropriate application for such abandonment with the Commission. The court may fix a time within which the Commission shall report to the court on such application.

3. The pending case filed by Auto-Train on September 8, 1980, is the first railroad reorganization case filed under the provisions of Subchapter 4 of Chapter 11 of the new Bankruptcy Code. 11 U.S.C. § 1161 et seq. Prior to the effective date of the substantive provisions of the Bankruptcy Reform Act of 1978, October 1, 1979, railroad reorganizations were conducted in the United States District Courts pursuant to the provisions of § 77 of the Bankruptcy Act. 11 U.S.C. § 205.

which authorized "the operation of a combined rail passenger automobile transport service between Alexandria, Virginia, on the one hand, and, on the other hand, Sanford, Florida, and for the construction of certain connecting tracks." (See *Auto-Train Corp., Operation Rail Passenger and Automobile Transport Service between Alexandria, Va., and Sanford, Fla.,* 342 ICC Reports 533 (1971) (Finance Docket No. 26482)).[4] The ICC opinion further declared that:

> "In Finance Docket No. 26482, we find that under Section 1(18) of the Interstate Commerce Act the present and future public convenience and necessity require operation by Auto-Train Corporation, of a combined rail passenger automobile transfer service between Alexandria, Va., on the one hand, and, on the other, Sanford, Fla." *Supra,* 342 I.C.C. at 545.

Auto-Train operations between Virginia and Florida were conducted over the connecting lines of SCL and RF&P pursuant to an operating agreement which provided for trackage rights and the utilization of SCL crews under certain defined conditions. The financial problems of Auto-Train, although originating prior to 1980, were first highlighted when the rail carrier filed for relief under the new Bankruptcy Reform Act on September 8, 1980. At the time of its filing, the railroads—SCL and RF&P—were owed in excess of 6 million dollars under the subject operating agreement. It appeared at that time that the carrier was insolvent; however, they were commencing a new season where revenues were expected to exceed the current operating expenses.[5]

By early April of the succeeding year, 1981, after a rejection by the Federal Railway Administration for federally guaranteed loan certificates,[6] Auto-Train's only hope of survival was a massive infusion of equity capital.[7] When this infusion of equity capital did not materialize, the trustee properly filed his application to terminate rail service and to seek court approval of his rejection of the operating agreement between Auto-Train and the designated railroads, SCL and RF&P. (See Application for Authority to Cease Operation of the Debtor Railroad and for Approval of the Settlement Agreement and the Settlement Agreement Attached thereto as Exhibit A, filed April 24, 1981.) At the April 24 hearing before this court, it became clear that the following events had occurred:

1. A proposed agreement with the "Middendorf group" which was to "close" on April 15, 1981, had not occurred and no equity capital was available for further train operations. (Id. at ¶¶ 4 and 5)

2. The application with the Federal Railway Administration for Loan Guarantees had previously been rejected on January 15, 1981.

3. As of April 24, 1981, the trustee was without funds to continue the debtor's train service. There were no funds for the payment of payroll and other essential services as outlined by the trustee. (*Id.* at ¶ 6.)

4. Income and expense projections clearly indicated that if operations were to con-

---

4. The ICC opinion further described Auto-Train operations in these words:

> "The Auto-Train Corporation proposes to offer a unique, regularly scheduled, Auto-Train service that will simultaneously transport automobiles and their occupants by specially designed railroad trains. It proposes to initiate this service between termini located in Alexandria, Va., and Sanford, Fla., over the existing railroad lines of RF&P from Alexandria to Richmond and SCL from Richmond to Sanford.

> "Auto-Train is a Florida corporation organized for the purpose of engaging in business as a carrier by railroad subject to the Interstate Commerce Act."

*Supra.* 342 I.C.C. at 534.

5. The evidence of record clearly demonstrates that Auto-Train's peak operating season is between the months of September through April.

6. The trustee's application filed on January 8, 1981, was rejected on January 15, 1981.

7. In November of 1980, the trustee incurred new debt in the full sum of $400,000 pursuant to an agreement dated November 15, 1980. (See Order dated November 17, 1980), which agreement also provided for a potential equity interest for the named investors (referred to on the record as "The Middendorf group").

tinue beyond April 24, 1981, in the absence of additional funds provided under the settlement agreement with SCL and RF&P, the cumulative deficit for April and May alone would exceed 1 million dollars. This deficit, moreover, would continue to grow over the summer months.

5. The financial information supplied to the Bankruptcy Court by way of evidence at the hearing on April 24, 1981, clearly reflects a completely and hopelessly insolvent debtor. (The schedules and pleadings filed with the Bankruptcy Court to date estimate that total liabilities will be in the neighborhood of 26 million dollars, and that there are assets of only approximately 2 million dollars).[8]

6. Testimony by a financial consultant at the time of the April 24 hearing[9] indicated that the cashlessness of Auto-Train, as of April 1981, would in no way change later in the year when Auto-Train would, under ordinary circumstances, enter its peak operating season.

7. Any future train operations by the carrier would significantly threaten and prejudice the interest of all creditors—secured and unsecured alike.[10]

It is important to note that the financial statements and information supplied by the trustee were in no way challenged by any creditor or party in interest. In fact, as a result of this court's ruling on various creditor complaints for relief from the provisions of the automatic stay [11 U.S.C. § 362(a)] this carrier has had substantially all of its rolling stock reclaimed by creditors pursuant to the provisions of 11 U.S.C. § 1168(a). Additional creditor complaints are still pending and the ultimate outcome clearly supports the testimony received to date in connection with the April 24th hearing. Auto-Train, beyond per adventure, is in a state of "cashlessness" and is incapable of future train operations.

## II. LEGAL ISSUES
(Abandonment Pursuant to 11 U.S.C. § 1170)

■ The trustee's principal contention regarding the legal concept of "abandonment" relates to the undisputed fact that Auto-Train did not operate the service in issue, nor did it operate its service over its own railroad lines. Auto-Train, in the opinion of the trustee, merely ceased operations because of its "cashless" position. (*See* Trustee's Memorandum at 3–4, filed May 22, 1981.) The trustee's argument, however, overlooks the fact that Auto-Train is a regulated rail carrier under the Interstate Commerce Act and was operating its service pursuant to a certificate of public convenience and necessity. As a regulated carrier, the trustee is clearly subject to ICC regulations within the ordinary parameters of 11 U.S.C. § 1166 of the Code. 11 U.S.C. § 1166, in relevant part, expressly provides that:

> "Except with respect to abandonment under Section 1170 of this title, or merger, modification of the financial structure of the debtor, or issuance or sale of securities under a plan, the trustee and the debtor are subject to the provisions of the Interstate Commerce Act (49 U.S.C. 1 et seq.) that are applicable to railroads...."

However, when "abandonment" is at issue, 11 U.S.C. § 1170 sets forth the prescribed conditions under which such abandonment may be authorized—namely, if it is in the best interest of the estate, and if the trustee files the appropriate application with the Interstate Commerce Commission (11 U.S.C. § 1170(a)(1)(A) & (B). Accordingly, the Court must first determine whether an

---

8. It should also be noted, of course, that the figures, although approximations, do not make reference to a large body of personal injury claims outstanding which may exceed 3,000 in number and which claims, as of this date, are contingent and unliquidated.

9. At the request of several creditors and parties in interest, the trustee adduced testimony from Auto-Train's financial consultant, Roger Rosenberger. The financial projections and the financial evidence of record have in no way been controverted by any creditor or agency in interest.

10. Such a finding is clearly warranted in view of the financial evidence available at that time.

"abandonment" has in fact occurred, as opposed to a "cessation of service" as posited by the trustee; and, if so, whether the abandonment is within the statutory intendment of 11 U.S.C. § 1170.[11] With respect to the issue of "abandonment" *vel non*, this Court finds that Auto-Train has not only ceased all of its train operations but that such cessation is of a permanent nature.[12] The legal concept of abandonment signifies an intention by the regulated carrier to permanently terminate all service. *See ICC v. Chicago Rock Island, and Pacific R.R.*, *supra*, 501 F.2d 908; *ICC v. Baltimore & Annapolis R.R.*, 398 F.Supp. 454 (D.Md.1975); *ICC v. St. Johnsbury & Lamoille County R.R.*, 403 F.Supp. 903 (D.Vt.1973); *Brown v. Consolidated Rail Corporation*, 422 F.Supp. 1251 (N.D.Ohio 1976). It matters little whether the train service is over the leasehold lines of another carrier [*Smith v. Hoboken R.W.&S.C.*, 328 U.S. 123, 130, 66 S.Ct. 947, 951, 90 L.Ed. 1123 (1945)]; or whether trackage rights with another non-debtor carrier are involved, [*Thompson v. Texas Mexican R.*, 328 U.S. 134, 66 S.Ct. 937, 90 L.Ed. 1132 (1945)]. The intent of the carrier "to indefinitely or permanently cease all *service*" [emphasis added] is the primary factor, therefore, in determining whether an "abandonment" has occurred. *Brown v. Consolidated Rail Corporation, supra*, 422 F.Supp. at 1257. Having determined that there was a factual "abandonment", however, does not equate with whether there was an "abandonment" within the meaning of the applicable statutes. (49 U.S.C. § 10903; 11 U.S.C. § 1170.) In other words, with reference to Auto-Train operations, the issue is whether there has been an abandonment for purposes of compliance with 11 U.S.C. § 1170.

■ In reaching its conclusion, this court is not unmindful of the crucial and vital role the Interstate Commerce Commission has played in determining whether abandonments should be authorized in railroad reorganization cases, and, in turn, the court has attempted to relate the now advisory role of this agency to the present context of 11 U.S.C. § 1170 of the Bankruptcy Reform Act.[13] As early as 1926, the Supreme Court, in *Brooks-Scanlon Company v. Railroad Commission*, 251 U.S. 396, 40 S.Ct. 183, 64 L.Ed. 323 (1926) recognized that a privately financed railroad is under no obligation to continue service when it is hopelessly insolvent. To do so would create grave constitutional problems.[14] Despite the fact

---

11. In *ICC v. Chicago, R.I. & P. R.R.*, 501 F.2d 908, 913 (8th Cir. 1974), the Court aptly phrased the court's role in these words:

    "We emphasize that the question before the District Court does not concern the merits of the abandonment application—this is a matter for the ICC—but merely the narrow issue of whether an abandonment has occurred."
    Under the Railroad Reorganization Act, Section 77(*o*), 11 U.S.C. § 205(*o*) (1976), the statutory authority expressly limited the Court to authorizing abandonment only after "the approval and authorization of the Commission when required by the Interstate Commerce Act as amended February 28, 1920, or as it may be hereafter amended."

12. Intervenors, at the April 24th hearing, raised the specter of their being a possible plan of reorganization because of certain remarks made by the attorney for the Middendorf group. Such a plan of reorganization has, of course, not been filed, as intimated by said counsel, and, in fact, in view of the stringent requirements of Section 1129(a), dealing with the confirmation of a plan under Chapter 11, it is clear that such a plan cannot be filed.

13. 5 Collier on Bankruptcy § 1170.01 at 1170–2 (15th ed. 1980). The present role of the Bankruptcy Court is explained in Collier on Bankruptcy as follows:

    "Power to authorize abandonments (permanent discontinuance of railroad services and removal of track) is shifted from the ICC to the presiding reorganization court."

14. In relevant part, the Supreme Court found:

    "It is true that if a railroad continues to exercise the power conferred upon it by a charter from a State, the State may require it to fulfil an obligation imposed by the charter even though fulfilment in that particular may cause a loss ... But that special rule is far from throwing any doubt upon a general principle too well established to need further argument here ... If the plaintiff be taken to have granted to the public an interest in the use of the railroad it may withdraw its grant by discontinuing the use when that use can be kept up only at a loss." *Brooks-Scanlon Co. v. Railroad Comm., supra*, 251 U.S. at 399, 40 S.Ct. at 184.

that *Brooks-Scanlon* was decided prior to the ICC amendments of February 1920 (which amendments gave the Interstate Commerce Commission jurisdiction over abandonment procedures) its doctrine has still been followed and applied by the courts in a fairly consistent way. In the context of the Auto-Train case, resort to the Interstate Commerce Commission's regulatory process for its advisory opinion pursuant to § 1170 would seem to be negated by the "cashlessness" of the subject carrier.

In order to properly assess the doctrine of "cashlessness" in the context of railroad reorganizations, it is necessary to analyze and place in proper perspective those cases which have treated the issue. First, it has been recognized by the Courts that where train operations are terminated by circumstances completely beyond the carrier's control this "would not give rise to an abandonment under 49 U.S.C. § 1(18)." *I.C.C. v. Chicago, Rock Island & Pac. R.R.*, 501 F.2d 908, 911 (8th Cir. 1974).[15] More difficult questions are raised, however, when the cessation of operations is caused by the purported unprofitability or insolvency of the rail carrier. The trustee is not free to ignore the statutory mandates[16] under the Bankruptcy Code simply because a railroad's operation is unprofitable or burdensome. As appropriately stated by Judge Friendly in *In re Valuation Proceedings* under Section 303(c) and 306 of the Regional Rail Reorganization Act, 439 F.Supp. 1351, 1371 (Special Court, Regional Rail Reorganization Act 1977):

"To be sure, no matter how profitable it may have been in the past, a railroad cannot be compelled to operate indefinitely at a loss. But Congress may constitutionally require, without thereby engaging in a taking, that operations continue until a certificate of abandonment has been obtained through proceedings conducted by an administrative agency with reasonable promptness.

"A fourth proposition is that when Congress has specified a particular procedure, namely, application to the ICC, for obtaining authority to abandon, a railroad or its trustee cannot opt out from the statutory requirement in favor of other procedures which they consider just as good."

However, the Court did, in a footnote at 439 F.Supp. 1379 n.49, with respect to the issue of "cashlessness" opine:

"This phrase requires some elucidation in view of what seems to be the prevelant assumption that the trustee of a losing railroad in a § 77 proceeding could disregard § 1(18) of the Interstate Commerce Act. As previously indicated we regard this assumption as erroneous *except* when cessation of operations would have been required by 'cashlessness' or other circumstances beyond a trustee's control." [emphasis added]

Again, the same court speaking through Judge Friendly, explained the apparent ex-

---

**15.** *See ICC v. Chicago & Northwestern Transportation Co.*, 407 F.Supp. 827 (S.D.Iowa 1975) (in which the Court found abandonment was not beyond the control of the railroad if cessation of services was caused by the railroad's failure to maintain the tracks.); *Meyers v. Arkansas & O.·Ry.*, 185 F.Supp. 36 (W.D.Ark. 1960) (involuntary cessation brought about by flooding.) *See also Zirn v. Hanover Bank*, 215 F.2d 63 (2d Cir. 1954) (where creditor repossession of rolling stock necessitated an involuntary cessation of operations.)

**16.** In the context of this railroad reorganization, the mandatory requirements for abandonment and resort to the ICC regulatory process is spelled out clearly in Section 1170(b):

"(b) If, except for the pendency of the case under this chapter, such abandonment would require approval by the Commission under a law of the United States, the trustee shall initiate an appropriate application for such abandonment with the Commission. The Court may fix a time within which the Commission shall report to the Court on such application.

(c) After the Court receives the report of the Commission, or the expiration of the time fixed under Subsection b of this section, whichever occurs first, the Court may authorize such abandonment after notice to the Commission, the Secretary of ·Transportation, the trustee, any party in interest that has requested notice, any affected shipper or community, and any other entity proscribed by the Court, and a hearing."

ception by reference to their earlier exception in *In re Penn Central* (180–Day Appeal Decision), 384 F.Supp. 895, 919 (Special Court, Regional Rail Reorganization Act 1974). In this opinion the Court states that:

> "Although the fundamental principle of Brooks-Scanlon remains unimpaired, the right to withdraw the grant has been procedurally qualified in two ways.[31]"

The Court at this point explained this qualification in Footnote 31 which reads:

> "[31] We assume neither of the qualifications mentioned below could apply if, after all reasonable efforts, a reorganization trustee was faced with an imminent depletion of cash that would make it impossible for him to pay current bills for wages, supplies, interline balances, and similar expenses, and still leave an amount sufficient to permit an orderly liquidation." 384 F.Supp., *supra* at 919 n.31.

The Court then proceeds in the text of the opinion to explain the two ways that *Brooks-Scanlon* can be procedurally qualified.

> "One is that the reorganization court must be allowed a reasonable time to determine whether management can be improved, the property can be restructured so as to restore its earning power, or a disposition more consistent with the public interest than liquidation can be found. Under the rule of *Continental Illinois National Bank & Trust Co. v. Chicago R.I. & P. Ry.*, 294 U.S. 648 [55 S.Ct. 595, 79 L.Ed. 1110], where creditor's remedies, the exercise of which might seriously impair formulation of an effective plan of reorganization, were held in abeyance during a period in which the collateral could decline, the estate of a railroad may be made to suffer interim losses for a reasonable period during which a feasible plan of reorganization may be developed. The key finding prerequisite to such postponement of creditors' remedies is the likelihood of successful reorganization, variously described in analogous contexts as probably feasible and highly likely."

In *In re Chicago, Milwaukee, St. Paul and Pacific R.R.*, 611 F.2d 662 (7th Cir. 1979), the court was confronted with a lower court ruling which directed the trustee "to immediately commence proceedings before the ICC to abandon the Milwaukee Road's entire rail system and to file a plan of reorganization of the Milwaukee Road with the district court." Id. at 666 [footnote omitted]. The court explained, with reference to the cashlessness doctrine, that:

> "It is settled that a railroad that is cashless cannot be required to continue operating to serve the public interest. The situation here represents an exception, recognized in *Valuation Proceedings*, 439 F.Supp. 1379, n. 49, to the statutory requirement that abandonment or discontinuance of railroad lines requires a finding by the ICC that "the present or future public convenience and necessity require or permit the abandonment or discontinuance." 49 U.S.C. § 10903. *Id.* at 669. [citations omitted].

Intervenors are attempting to distinguish this case in these words:

> "This permanent cessation of operations, intervenors respectfully submit, is separate and distinct from the immediate cessation of operations which may be justified by the 'cashlessness' doctrine set forth *In re Chicago, Milwaukee, St. Paul & Pacific R.*, 611 F.2d 662 (7th Cir. 1979), and is an abandonment within the meaning of 11 U.S.C. § 1170. That distinction is recognized not only by the language of the *Milwaukee* case (611 F.2d at 668–70) but the fact that the Milwaukee Railroad Trustee has continued to seek abandonment authority under Section 5(a) of the Milwaukee Railroad Restructuring Act, 45 U.S.C. § 904(a), to abandon those lines operations for which a 'cashlessness' embargo was authorized under the *Milwaukee* decision. E. g., ICC docket number AB–7 (Sub-Nos. 86, 96)."

Memorandum of Intervenor Labor Organizations In Support of Motion to Alter or to Amend, or in the Alternative, for a Stay Pending Appeal at 2, filed May 4, 1981.

However convincing this might appear facially, the Court is of the opinion that the special legislation enacted by Congress which makes Section 1170 applicable at the discretion of the court to pending railroad reorganizations (Title 45 U.S.C. § 915) presents an entirely different situation from the Auto-Train case. Auto-Train operations are obviously not covered by any special Congressional legislation nor are they likely to be. If there is a truly meritorious position advanced as to its "cashlessness", the clear and compelling logic of these cases points to the conclusion that resort to the statutory requirements relating to abandonment is not required. Such a conclusion would, moreover, be logically mandated because of the following factors:

1. Where "cashlessness" exists as defined in the *Milwaukee* case, *supra*, there is only one inescapable conclusion that the ICC could ordinarily reach, namely, one of abandonment;

2. Where a railroad has reached a position of "cashlessness", there are obvious constitutional concerns involving the secured and unsecured creditors which only the courts can address;

3. The economics of cashlessness, as posited by such cases as the *Milwaukee* case, are as easily determined, in the first instance, by the Courts as by an administrative agency.

This conclusion, on the part of the Court, is not intended to imply that a trustee can simply ignore the proscribed statutory procedures because of a given or momentary financial crisis. However, where there is, as amply demonstrated by the record before this Court,[17] a hopeless and insoluble financial crisis (amounting to "cashlessness" as defined by prior case law), requiring the trustee to resort to the statutory requirements of Section 1170 would be to require a futile and useless gesture on the part of the trustee.[18] It is clear to the Court that, since there is the undisputed cashlessness of Auto-Train, there is hence no abandonment and the mechanism of Section 1170 is not required.

## REQUIREMENTS FOR LABOR PROTECTION

■ Based on this Court's holding that "abandonment" procedures within the parameters of Section 1170 are not applicable in Auto-Train because of the demonstrated "cashlessness" of the carrier, the applicability of Section 1170(e)(1), (2) would not ap-

17. It is clear from the evidence before this Court (including the filed financial reports of the trustee) that Auto-Train is in no position for any infusion of financial aid which could in any way restore it to any semblance of profitability within the reorganization framework of a Chapter 11 case. Auto-Train, as aptly described by the trustee, is a small and unique operation. Aside from its rolling stock, which has now been partially repossessed and is subject to reclamation by reason of court orders, it has no rail lines of its own. Even during its "heyday" Auto-Train operations were limited to a small segment of the public, and its operations, as unique as they were, are capable of being assumed by other carriers or transportation mediums.

18. While resort to mandated statutory procedures should not be ignored, it should be noted in the context of this case that even if the trustee were to comply with the statutory requirements of Section 1170, the outcome would, of course, be no different. Notice of the trustee's application was duly served upon the Interstate Commerce Commission (as well as the Department of Transportation) and an ap-

pearance was duly noted by Mr. Daniel Linhart of the Interstate Commerce Commission at the April 24th hearing. When asked by the court the position of the Interstate Commerce Commission concerning the issues·then pending before it, Mr. Linhart unequivocally stated that there was no opposition to the relief requested in the trustee's application. Moreover, it should be noted that notice of the proposed application for liquidation of Auto-Train, has not only been served upon all parties and creditors in interest, but the Court directed that the trustee specifically serve publication notice in newspapers in all communities in which Auto-Train operations occurred—Virginia and Florida. Accordingly, even if this Court were to direct compliance with Section 1170, which, as stated above, the Court feels is not necessary because there is no abandonment within the intendment of the statute, the result would obviously be clear—abandonment could be the only recommended alternative by the regulatory agency. In fact, because the role of the ICC is advisory only, the Court would be free to ignore the report.

pear to be applicable either. Sections 1170(e)(1), (2) were added to the Bankruptcy Code in October 1980 by Section 227(a) of the Staggers Rail Act of 1980, 94 Stat. 1931. The statute requires in pertinent part that:

"(e)(1) In authorizing any abandonment of a railroad line under this section, the court shall require the rail carrier to provide a fair arrangement at least as protective of the interests of employees as that established under Section 11347 of title 49.

(2) Nothing in this subsection shall be deemed to affect the priorities or timing of payment of employee protection which might have existed in the absence of this subsection.

Title 49 U.S.C. § 11347 provides in pertinent part that:

"When a rail carrier is involved in a transaction for which approval is sought under sections 11344 and 11345 or section 11346 of this title, the Interstate Commerce Commission *shall* require the carrier to provide a *fair* arrangement at least as protective of the interest of employees who are affected by the transaction as the terms imposed under this section before February 5, 1976, and the terms established under Section 565 of title 45." [emphasis added.]

Intervenors argue that with reference to the use of the mandatory "shall", protective benefits must be imposed under Section 1170 and that the use of the word "shall" leaves the court with no discretion. Such a construction of the statutory scheme overlooks the term "fair" which must be determined by the courts, in light of the relevant circumstances of each case. The trustee, during the reorganization has taken considerable steps to protect the interest of Auto-Train's employees.[19] However, this railroad is now cashless and it would seem

that imposition of protective measures, even of a non-monetary type as posited by intervenors are entirely unwarranted under the facts of this case; even assuming arguendo, the applicability of Section 1170(e)(1).

Moreover, it should be pointed out that prior court cases which have construed the applicability of labor protection benefits under the Interstate Commerce Act, namely, *In re Chicago, Rock Island & Pacific R.R.,* 363 I.C.C. 150, 161 (1980), *appeal pending,* No. 80–1788 (7th Cir.); *In re New York, Susquehanna & Western Ry.,* 504 F.Supp. 851, 857 (D.N.J.1980), have held that it is discretionary with the Court as to what benefits, if any, should be imposed. In *In re New York, Susquehanna & Western Ry.,* Judge Whipple, in a well-reasoned opinion, cited the case of *Northampton & Bath R.R. Co. Abandonment,* 354 I.C.C. 784 (1978) which dealt with entire line abandonment. It was found in that case that:

"Congress did not intend to curtail the Commission's discretion regarding protective conditions in entire line abandonments.

After the entire line of a railroad is abandoned, no operating carrier remains to enjoy the benefits of the abandonment or pay the costs of employee protection. The Commission has generally refused to impose employee protective conditions which would in effect, require continued operation for the benefit of employees or further consumption of a failed railroad's properties for payment of employees' benefits after operations cease. The conditions imposed by the review board, those developed in Oregon Short Line, are not appropriate for an entire line abandonment where the abandoning railroad has no rail carrier or affiliate which continues operations similar to its own." *su-*

---

19. As demonstrated by the record before this Court, and as pointed out in oral argument by trustee's counsel at the May 26, 1981 hearing, the trustee had (1) paid all post-petition employee wages in full through the close of operation, and had provided employees with notice of the termination of May 1, 1981; (2) had caused the reinstatement of certain insurance benefits for Auto-Train employees and (3) reduced the time lag within which employees were previously paid by Auto-Train.

*pra,* 354 I.C.C. at 785–786. [footnotes omitted.]

It is clear, under the facts of this case, even if one assumed the applicability of § 1170(e)(1), (2), that Auto-Train has completely ceased all rail operations. The Auto-Train trustee has already filed for authority to liquidate as evidenced by the trustee's affidavit filed in connection with such application (Trustee's Affidavit, ¶ 5, filed May 22, 1981):

> "Based upon his evaluation of the Debtor's estate, the Trustee estimates that the total cash which is likely to be realized by the estate in liquidation will be inadequate fully to cover the unpaid expenses of administration in reorganization and the expenses of liquidation, even excluding personal injury claims deemed expenses of administration pursuant to Bankruptcy Code Section 1171."

For these compelling reasons, the Court will decline to grant the relief requested by the Intervenors, both for legal reasons and because of the circumstances existing in this railroad reorganization.

### STAY PENDING APPEAL PURSUANT TO SECTION 1170(d)(1)

The final issue to be addressed by this Court is the request for a stay pending appeal pursuant to the statutory provisions of Section 1170(d)(1).[20] In view of this Court's ruling with respect to the issue of abandonment under Section 1170 generally the court must decline relief under this section and deny the request for a stay of this court's order of April 24, 1981.

Furthermore, such a denial is predicated on a traditional balancing of the equities (*See Blankenship v. Boyle,* 447 F.2d 1180 (D.C.Cir.1971)) and when applied to this case a stay is clearly not warranted. Auto-Train has ceased its operation as of May 1, 1981, and reinstatement of service is accordingly not possible. Even intervenors recognize this in their brief. Requiring the trustee to pursue administrative procedures is clearly not warranted for the reasons already covered in this Court's opinion and any delay in acting upon the trustee's request for liquidation would only inure to the prejudice of all parties and creditors involved.[21]

### CONCLUSIONS

For the reasons set forth in this Court's Memorandum Opinion, the application of the Intervenors is denied in its entirety.

---

20. Section 1170(d) provides that:

   "(1) Enforcement of an order authorizing such abandonment shall be stayed until the time for taking an appeal has expired, or, if an appeal is timely taken, until such order has become final."

   "(2) If an order authorizing the abandonment of a railroad line is appealed, the court on request of a party in interest, may authorize termination of service on a line or a portion of a line pending the determination of such appeal, after notice to the Commission, the Secretary of Transportation, the trustee, any party in interest that has requested notice, and any affected shipper or community, and any other entity prescribed by the court, and a hearing. An appellant may not obtain a stay of the enforcement of an order authorizing such termination by the giving of a supersedeas bond or otherwise, during the pendency of such appeal."

21. It is interesting to note, as an historical aside, that the original certificate of public convenience and necessity issued by the Interstate Commerce Commission in 1971 provided:

   "Auto-Train, acquiring carrier status by virtue of these transactions, has railroad employees entitled to protection under the act. Its employees are new, as is the proposed operation, and, under the circumstances, protective guarantees are not warranted."

   *Auto-Train, Rail Passenger and Auto Transport Service,* 342 I.C.C. 533, 542 (1971).